# Syllabus

| | |
|---|---|
| Chief Justice:<br>Robert P. Young, Jr. | Justices:<br>Stephen J. Markman<br>Brian K. Zahra<br>Bridget M. McCormack<br>David F. Viviano<br>Richard H. Bernstein<br>Joan L. Larsen |

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

HECHT v NATIONAL HERITAGE ACADEMIES, INC

Docket No. 150616.  Argued March 10, 2016 (Calendar No. 3).  Decided July 26, 2016.

Craig Hecht brought an action in the Genesee Circuit Court alleging that his employment was terminated by National Heritage Academies, Inc., in violation of the Michigan Civil Rights Act (CRA), MCL 37.2101 *et seq*.  Plaintiff had been employed as a teacher by defendant when he made racially charged comments.  When later questioned about the comments by his supervisors, plaintiff provided inconsistent explanations.  Plaintiff also allegedly attempted to interfere with his supervisors' investigation of the incident by asking a witness to change his statement about what had happened.  Plaintiff was subsequently terminated.  Plaintiff asserted that his attempts to find new employment as a teacher were hampered by defendant's mandatory statutory disclosures to other schools of his record of unprofessional conduct.  Before trial, defendant moved to preclude plaintiff from presenting evidence of the disclosures because the disclosures were required by MCL 380.1230b and a school employer that discloses information in good faith under the statute is immune from civil liability for the disclosure.  The court, Geoffrey L. Neithercut, J., ruled that the evidence was admissible.  Defendant moved for a directed verdict at the close of plaintiff's case in chief, arguing that this was a disparate-treatment discrimination case and plaintiff had not shown that any of defendant's other employees engaged in the same or similar conduct.  The court denied the motion.  The jury returned a verdict in favor of plaintiff, finding that he had proved that race was a factor in his termination, that he had shown $50,120 in past economic loss, and that he had shown $485,000 in future economic loss.  Defendant moved for judgment notwithstanding the verdict (JNOV), a new trial, or remittitur.  The court denied the motion.  The Court of Appeals, SERVITTO, P.J., and CAVANAGH, J. (WILDER, J., dissenting), affirmed in an unpublished opinion.  The Supreme Court granted defendant's application for leave to appeal.  498 Mich 877 (2015).

In an opinion by Chief Justice YOUNG, joined by Justices MARKMAN, ZAHRA, MCCORMACK (as to Parts I, II, and III), VIVIANO, BERNSTEIN (as to Parts I, II, and III), and LARSEN, the Supreme Court *held*:

In light of the circumstantial evidence presented and all the inferences that could have been reasonably drawn from that evidence in favor of the jury's liability verdict, a reasonable jury could have concluded that defendant violated the CRA.  However, because MCL 380.1230b afforded defendant complete immunity from civil liability flowing from the mandatory disclosures compelled by that statute, the trial court erred by allowing the jury to consider the

disclosure evidence. Accordingly, the award of future damages had to be vacated and the case remanded for further proceedings.

1. When reviewing a motion for JNOV, an appellate court must construe all the evidence and the inferences arising from the evidence in the nonmoving party's favor. If reasonable jurors could have honestly reached different conclusions, the jury verdict must stand. Under MCL 37.2202(1) of the CRA, an employer may not discharge or otherwise discriminate against an individual with respect to employment because of race. A claim under the CRA requires proof of "but for" causation. There are multiple ways to prove that a plaintiff was the victim of unlawful discrimination, including direct evidence of discrimination, i.e., evidence that proves impermissible discriminatory bias without additional inference or presumption. In this case, however, contrary to the conclusion of the Court of Appeals majority, defendant failed to present direct evidence of discrimination. One way of proving unlawful discrimination without direct evidence is by showing that the plaintiff was treated unequally to a similarly situated employee who did not have the characteristic protected under the CRA. Thus, an employer's differing treatment of employees who were similar to the plaintiff in all relevant respects, except for their race, can give rise to an inference of unlawful discrimination. In order for this type of evidence to give rise to such an inference, the similarly situated employee must be nearly identical to the plaintiff in all relevant respects. In this case, plaintiff presented a different kind of circumstantial evidence: circumstantial evidence that his employer considered his race in its decision to discharge him. Plaintiff argued that the black employees routinely engaged in racial banter, but were not disciplined. There were distinctions between the comments made by plaintiff and those made by defendant's black employees that, if credited by the jury, might have allowed the jury to find for defendant. However, plaintiff presented additional evidence that defendant considered plaintiff's race in terminating him. Specifically, plaintiff also presented evidence that defendant's management employees were aware of and tolerated the unequal enforcement of defendant's stated zero-tolerance policy. The evidence, if believed, suggested that defendant's management employees prohibited negative stereotyping in the workplace except when negative stereotyping comments were made by defendant's black employees. The jury was thus shown the difference between defendant's policy in theory and its racially biased application. This was potent circumstantial evidence of defendant's allegedly racially biased decision-making. This evidence could have allowed a reasonable jury to conclude that defendant applied a different standard to plaintiff's conduct based on his race. Accordingly, the jury could reasonably have found that race was a "but for" cause in defendant's decision to investigate plaintiff and escalate punishment for his racial comments. Similarly, while defendant presented nondiscriminatory reasons for its decision to terminate plaintiff, plaintiff presented sufficient evidence for a reasonable juror to reject those race-neutral reasons as unbelievable. The jury's verdict, finding a violation of the CRA, was supported by the totality of the evidence presented and the reasonable inferences in plaintiff's favor that could be drawn from that evidence.

2. Generally, all relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the state of Michigan, the rules of evidence, or other rules adopted by the Supreme Court. Evidence may also be prohibited by statute. MCL 380.1230b provides that before hiring an applicant for employment, school employers must request that the applicant sign a statement (1) authorizing the applicant's current or former employer or employers to disclose to the school employer any unprofessional conduct by the

applicant, and (2) releasing the current or former employer from any liability for providing that information. Before hiring an applicant for employment a school employer must request that the applicant's current or prior employer provide information concerning the applicant's unprofessional conduct, if any. After receiving such a request, a school employer must provide the information requested and make available to the requesting school employer copies of all documents in the employee's personnel record relating to the unprofessional conduct. A school employer that discloses information in good faith under the statute is immune from civil liability for the disclosure. In this case, plaintiff argued that he was not precluded from presenting evidence of the mandatory disclosure because he did not sue for the disclosure itself—he sued for a violation of the CRA and presented evidence of the adverse impact of the disclosure to establish future damages. Plaintiff's belief was that only a direct action for the disclosure, e.g., a defamation claim, was precluded by MCL 380.1230b(3), but the admission of evidence of the disclosures in a case such as this was permissible. The term "civil liability" is defined as being legally obligated for civil damages. The trial court's decision to admit evidence and argument regarding the mandatory disclosures for the purpose of assessing damages allowed the jury to impose against defendant legal obligations arising from the disclosure. This violated the plain language of the statute. There can be no damages without liability. A legislative decision to preclude liability necessarily precludes damages on the same basis. There is no textual support for the view that immunity under the statute depends on the nature of the claim underlying the civil liability. The improper admission of the disclosure evidence tainted the jury's future damages award, which had to be vacated.

Court of Appeals judgment is affirmed to the extent it held that plaintiff presented sufficient circumstantial evidence to sustain the jury's verdict finding that defendant violated the CRA; Court of Appeals judgment is reversed to the extent it held that the trial court properly admitted evidence of defendant's mandatory disclosures of plaintiff's unprofessional conduct; jury award of future damages is vacated; case is remanded to the trial court for further proceedings.

Justice MCCORMACK, joined by Justice BERNSTEIN, concurring in part and dissenting in part, agreed with the majority that plaintiff presented sufficient evidence of discrimination such that the trial court did not err by denying defendant's motion for JNOV, but disagreed with the majority's decision to vacate the jury award for future damages. MCL 380.1230b(3) confers immunity from liability, i.e., the state of being legally obligated for damages, "for the disclosure," not from paying money as compensation for a state of legal responsibility unrelated to the disclosure. Because the statutory immunity is tied to the liability not the remedy, MCL 380.1230b(3) only precludes imposing liability (and damages flowing therefrom) on a defendant when the liability arises from an injury caused by the disclosure itself. Disclosing plaintiff's unprofessional conduct did not create additional legal responsibility for which defendant was on the hook; rather, it was the alleged illegal act of discharging plaintiff based on his race that gave rise to defendant's liability. The injury from which the liability arose was the discriminatory discharge, not the disclosures. Introducing evidence of defendant's disclosures of plaintiff's conduct merely assisted the jury in determining the appropriate remedy for the discriminatory discharge. Because plaintiff's injury was the discriminatory discharge rather than defendant's disclosures, and it was the discriminatory discharge for which defendant was held

liable, the future damages award did not constitute civil liability for the disclosure, and the award of future damages should have been affirmed.

©2016 State of Michigan

# OPINION

Chief Justice:      Justices:
Robert P. Young, Jr.   Stephen J. Markman
                       Brian K. Zahra
                       Bridget M. McCormack
                       David F. Viviano
                       Richard H. Bernstein
                       Joan L. Larsen

FILED July 26, 2016

S T A T E   O F   M I C H I G A N

SUPREME COURT

CRAIG HECHT,

       Plaintiff-Appellee,

v

No. 150616

NATIONAL HERITAGE ACADEMIES,
INC.,

       Defendant-Appellant.

BEFORE THE ENTIRE BENCH

YOUNG, C.J.

In this race discrimination case, we must decide whether the trial court erred by denying defendant's motion for judgment notwithstanding the verdict (JNOV), and determine the propriety of the admission of evidence of defendant's mandatory reporting under MCL 380.1230b. We hold that the Court of Appeals did not err by affirming the trial court's denial of defendant's motion for JNOV on plaintiff's claim of discrimination under the Civil Rights Act (CRA), MCL 37.2101 *et seq*. Contrary to the Court of

Appeals, we conclude that there was no direct evidence of discriminatory animus concerning the firing of plaintiff. This case turned on circumstantial evidence—on the credibility of plaintiff's proofs that suggested there were racial reasons for his treatment and on the credibility of defendant's nonracial justifications for firing him. We conclude, based on the evidence presented and all the inferences that could be reasonably drawn from that evidence in favor of the jury's liability verdict, that a reasonable jury could have concluded that defendant violated the CRA.

Finally, because MCL 380.1230b afforded defendant complete immunity from civil liability flowing from the mandatory disclosures compelled by this statute, we hold that the trial court erred by allowing the jury to consider evidence of defendant's statutorily mandated disclosures of plaintiff's wrongdoing to other schools, and the Court of Appeals erred by affirming the trial court's decision in that regard.

For these reasons, we reverse in part and affirm in part the judgment of the Court of Appeals, vacate the jury award for future damages, and remand to the trial court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

Defendant, National Heritage Academies, Inc., is a company that owns and operates a number of public, independently operated schools, including Linden Charter Academy (LCA) located in Flint, Michigan. The student body at LCA is predominantly black. Plaintiff, Craig Hecht, is a white teacher who had been employed by defendant at LCA for approximately eight years, most recently serving as a third-grade teacher.

We draw from the evidence adduced at trial the following narrative concerning the events that led to plaintiff's termination. On November 3, 2009, Lisa Code, a white library aide at LCA, entered plaintiff's classroom during class time to return a computer table she had borrowed. Upon her arrival, however, Code realized that she had brought back the wrong table—the one she borrowed was white, whereas the one she returned was brown. Noting her error, Code asked plaintiff if he would prefer to have a white table, like the one she borrowed, or the brown one she had returned. Plaintiff responded, "[Y]ou know I want a white table, white tables are better." He continued, "[W]e can take all these brown tables and we can burn the brown tables." Also present for this exchange was Floyd Bell, a black paraprofessional assigned to plaintiff's classroom. After hearing plaintiff's comments, Bell and Code both "called a foul" on plaintiff, in accordance with the school's informal procedures for addressing inappropriate personal conduct.[1] Plaintiff denied hearing either Bell or Code call a foul on him, but later acknowledged that his comments were meant to imply that "white" people are better than "brown" people.

---

[1] The Court of Appeals opinion explained the meaning of "fouls" within defendant's professional conduct guidelines:

> LCA employees created a "social contract" with each other, such that if an individual stated something that someone else found offensive or inappropriate, the person offended was to "call a foul" on the speaker. In response, the speaker was to give two "ups" to the person who called the foul, which are positive statements about the person. In this instance, Plaintiff testified that he did not give any "ups" to either Bell or Code because he did not hear any foul called. [*Hecht v Nat'l Heritage Academies, Inc*, unpublished opinion per curiam of the Court of Appeals, issued October 28, 2014 (Docket No. 306870), p 1 n 1.]

3

Later that same day, Code reported the incident to Corrine Weaver, the dean of LCA. Weaver, in turn, reported the incident to her supervisor, Linda Caine-Smith,[2] the principal of LCA, who initiated an investigation. Caine-Smith and Weaver each separately interviewed plaintiff, Bell, and Code and took written statements from all three. Although Code's testimony at trial emphasized that plaintiff made the statements in front of a child, plaintiff's counsel also elicited testimony from Code that her November 4th written statement did not include that allegation.[3]

When questioned, plaintiff provided varying explanations regarding what had happened. At first, plaintiff confirmed to Weaver the general discussion about white and brown tables, but he denied that he meant anything racial by his statements. The

---

[2] Weaver and Caine-Smith are both white.

[3]     [*Plaintiff's Counsel*]: Where do you say [in your written statement] that Mr. Hecht said something to a child?

    [*Code*]: I didn't, but then it must be—

    [*Plaintiff's Counsel*]: Oh, you testified today that Mr. Hecht said to a child, the whites—brown should burn, white's better. That's what you said today. But on November 4th, you didn't say that, did you?

    [*Code*]: No, I didn't include that.

    [*Plaintiff's Counsel*]: You didn't refer to communication is with children at all, did ya?

    [*Code*]: No, not in this.

    [*Plaintiff's Counsel*]: You didn't even state in here that a child had heard what Mr. Hecht said, correct?

    [*Code*]: Right. Correct.

4

following day, plaintiff told Caine-Smith that he never said "brown should burn." However, later that day, plaintiff sent Caine-Smith a written statement in which he admitted to saying, "white tables are better than brown tables" and "all brown tables should burn." He also admitted that he involved a third-grade student in the "jok[e]" after he made the comments. Plaintiff subsequently met with Bell, apologized to him, and shook his hand.

At this point in the investigation, Caine-Smith contacted Courtney Unwin, defendant's employee relations manager, to discuss plaintiff's conduct and Caine-Smith's belief that plaintiff had lied during their initial conversation regarding the incident. Unwin then spoke directly to plaintiff, who, despite the admissions made in his earlier written statement, told her that his remark was simply a "tasteless joke," denied involving a student in the joke, and claimed that none of his students heard the exchange. Unwin also claimed that plaintiff called her later that day and stated that he could not even remember saying anything about brown tables burning, and then justified his conduct by reference to racial banter he suggested was regularly engaged in by black teachers at LCA. Plaintiff claimed that he told Unwin he was just kidding around, that similar joking happened all the time at the school, and that he would do anything to make it better.

Caine-Smith and Unwin met to discuss plaintiff's comments in the classroom and his versions of the incident. They discussed several disciplinary options, including a final written warning and termination. After that meeting, Caine-Smith called plaintiff to her office and told him he was being placed on immediate leave pending further investigation. Instead of leaving the building, plaintiff went into a room in which Bell

5

was tutoring students. Plaintiff asked the students to leave the room so that he and Bell could speak privately. He then asked Bell to change the statement he gave defendant. Bell declined the request and explained that he would not lie for plaintiff.[4]

Plaintiff also tried to contact Code by calling both her home and cellular phones. Code did not answer either call, but plaintiff left a voicemail stating that he was "desperate" to speak to her. Code testified that plaintiff had never before tried to contact her. Code further testified that plaintiff never asked her to change her statement.

The following day, Bell told Caine-Smith that plaintiff had asked him to lie. After receiving this information, Caine-Smith worried that plaintiff had similarly contacted Code. When asked, Code told Caine-Smith about the voicemail, causing Caine-Smith to consult with Unwin again. After their discussion, both Caine-Smith and Unwin determined that plaintiff was interfering with the investigation, and they decided to terminate plaintiff's employment. Notably, while Unwin testified that she believed plaintiff's intent was for Bell to lie, plaintiff's counsel called attention to Unwin's arguably contrary deposition testimony, in which she had previously testified that, to her

---

[4] On cross-examination, Bell testified that the only way to change his statement would be to "mak[e] it a lie." Nevertheless, Bell acknowledged that Hecht had apologized and that Bell had not included the apology in his statement, because he "didn't think it was sincere . . . ." Bell admitted it was his *opinion* that plaintiff had asked him to lie and that plaintiff did not explicitly ask him to lie. Plaintiff's counsel later argued to the jury that this evidence showed that plaintiff merely wanted Bell to include in his statement that plaintiff had apologized to him, not that plaintiff wanted Bell to lie.

6

knowledge, plaintiff did not ask anyone to lie.[5] Plaintiff's employment was terminated that day. Subsequently, plaintiff was replaced by a white woman hired by defendant.

After being fired from LCA, plaintiff began taking substitute teaching jobs, while simultaneously applying for long-term, full-time employment as a teacher. Plaintiff testified that every time he got close to securing such employment, the prospective employer would request his employment record from defendant, as required by law,[6] and, also as required by law,[7] defendant disclosed the fact that plaintiff was fired for his racially insensitive comments and his conduct during the investigation. Plaintiff testified that, because of these disclosures, he was unable to obtain full-time employment as a teacher. Plaintiff eventually obtained a nonteaching job as a machine operator, making approximately $14 per hour—considerably less than his salary with defendant.[8]

---

[5] When asked if plaintiff did anything to Code to obstruct the investigation, she answered, "Not to me, no."

[6] See MCL 380.1230b(2) ("Before hiring an applicant for employment, a school district, local act school district, public school academy, intermediate school district, or nonpublic school *shall* request at least the applicant's current employer or, if the applicant is not currently employed, the applicant's immediately previous employer to provide the information described in [MCL 380.1230b(1)(a), regarding unprofessional conduct], if any.") (emphasis added).

[7] MCL 380.1230b(3) ("Not later than 20 business days after receiving a request under subsection (2), an employer *shall* provide the information requested and make available to the requesting school district, local act school district, public school academy, intermediate school district, or nonpublic school copies of all documents in the employee's personnel record relating to the unprofessional conduct.") (emphasis added).

[8] At trial, there was conflicting testimony regarding plaintiff's claim that he was denied subsequent teaching employment solely or predominantly because of the statutorily mandated disclosure of his "unprofessional conduct." In fact, during cross-examination, plaintiff admitted that he likely would have obtained a position as a long-term substitute

In February 2010, plaintiff filed a complaint in the Genesee Circuit Court, alleging that defendant terminated his employment based on his race in violation of the CRA. Defendant moved for summary disposition arguing, among other things, that it had legitimate nondiscriminatory reasons for firing plaintiff and that his misconduct was not "similar" to that of any other employee. The motion was denied by the trial court. Defendant does not challenge the denial of summary disposition in this appeal.

Before trial, defendant moved, in limine, to preclude plaintiff from presenting evidence of its mandatory disclosure of plaintiff's unprofessional conduct to other schools. Defendant argued that the disclosures were required by law, pursuant to MCL 380.1230b, and that the same statutory provision immunized the disclosing school from civil liability for the disclosures. On this basis, defendant argued that plaintiff should be precluded from admitting these disclosures or other information related to them as evidence to establish civil liability.

Plaintiff countered, arguing that the statute only shielded defendant from *liability* stemming *directly from the disclosure*, such as when a plaintiff sues for defamation. Plaintiff claimed that he was seeking to use the disclosures for a different purpose: not to establish liability for defamation, but to establish his *future damages* resulting from the alleged employment discrimination because the disclosures to prospective school employers precluded him from obtaining another teaching position. The trial court ruled

_____

teacher had he not failed a drug test because it revealed the presence of unprescribed pain medication he received from his mother-in-law. Regardless of the actual cause of his difficulty in finding a teaching job, evidence of the statutorily mandated disclosures was presented to the jury as a cause of plaintiff's inability to obtain a teaching position.

8

that it would not limit the presentation of this disclosure evidence at trial, but it would consider jury instructions explaining the ways in which the evidence could be used.

At trial, plaintiff attempted to prove his CRA claim by establishing that the defendant applied different rules to white and black employees who engaged in racial banter: black employees were permitted to engage in such conduct without being reported or investigated, while plaintiff, a white employee, was subject to disciplinary investigation and escalation of punishment. Several witnesses testified about this issue.

One of these witnesses, Unwin, the LCA employee relations manager who was consulted on what course of action should be taken with plaintiff because of his racial comments and subsequent conduct during the investigation of those comments, testified that LCA had essentially a "zero tolerance" policy prohibiting any expression of negative racial "stereotyping" in the workplace. Under the LCA antidiscrimination policy, it was mandatory that any such racial remarks be reported and investigated.

The testimony of defendant's other managers involved in investigating and disciplining plaintiff permitted the jury to reach the conclusion that defendant's policy was applied differently depending on the race of the employee involved. Weaver testified that, a few days before plaintiff was fired, she reminded her supervisor Caine-Smith that racial banter happens among black employees without consequence. Weaver testified that Caine-Smith acknowledged that fact and acquiesced in the differential racial application of the policy. By contrast, Caine-Smith, on cross-examination, contradicted Weaver, testifying that she never had this conversation with Weaver.

Additionally, Weaver testified about other instances of "racial banter" that had occurred at LCA in which she was the target of negative racial stereotyping comments

9

from black employees. Weaver recalled that one time, Tim Jones, a black employee at LCA, made a negative racially stereotyping remark to her. This incident occurred when approximately 70 to 75 teachers and employees of defendant were on a bus ride back from a professional development meeting. Weaver stated that she was going to make fried pork chops for dinner, and Tim Jones responded by asking, " '[W]hy would you be making pork chops; you're white?' " Weaver did not report the incident, but testified that she called a foul on Jones. He faced no formal discipline for his comment.

Weaver also testified about an incident involving Kevelin Jones, another black employee of defendant. Weaver testified, "Well there was one time we had the Black History month and did the soul food thing; and Mr. [Kevelin] Jones made a comment to me about not eating it because I was white[.]" Weaver testified that she called a foul on Kevelin Jones, but that he also received no other punishment for his racial comment. Additionally, Weaver noted that she heard the " 'n' word" used by defendant's employees "[a] couple of times," and racial banter occurred regularly among her coworkers. None of this behavior resulted in reporting, investigation, or discipline. Moreover, Weaver admitted during questioning by plaintiff's counsel, as well as in her written statement, that she did not think plaintiff meant his comment to be racist. In addition, Weaver testified that when she first heard of the comment reported by Code, she also thought that it must have been a joke.

Plaintiff also testified during his case in chief and noted two additional instances of inappropriate racial commentary by black employees in the workplace. The first instance involved a black secretary at LCA, who called a student to accompany her by yelling, " 'hey, come here light skinned.' " The other instance involved a black employee

10

stating that a school mural of the children's cartoon character "Dora the Explorer" should be named " 'Laquisha,' " not " 'Dora,' " because the paint color used for her skin was so dark.

Plaintiff then testified regarding his posttermination difficulty in finding teaching employment. He noted that he had obtained long-term substitute teaching positions, but every time the school "caught wind" of the details of his firing because of the mandatory disclosure form defendant sent to each school, he was quickly let go.

At the conclusion of plaintiff's case in chief, defendant moved for a directed verdict, arguing that plaintiff had not shown that any other LCA teacher, or even any of defendant's employees, ever engaged in the same or similar conduct. In fact, defendant argued, plaintiff even admitted that he was aware of no other instance of a teacher making a racial or racist remark in a classroom in the presence of children. Plaintiff responded by noting the testimony showing black employees made racial jokes but faced no discipline whatsoever. Plaintiff also cited the statement attributed to Caine-Smith regarding the rules about racial banter being different for black employees. Defendant repeated that the only instances of racial conduct that plaintiff could point to did not occur in front of children and, therefore, plaintiff was not similarly situated to those employees. The trial court agreed with plaintiff and held that there were "a whole bunch of similarly situated educators" and, taking the evidence in the light most favorable to the nonmoving party, denied defendant's motion.[9]

---

[9] As discussed later in this opinion, defendant did not adequately present the issue of the trial court's denial of its motion for directed verdict in the Court of Appeals and, thus,

Plaintiff then argued as follows in closing:

This man and his little family have groaned with the anguish of what happened here. *Every time he tries to get on his feet, they kick him back down again with these* [*mandatory disclosures*]. Every time he gets on his feet, they kick him back down. *He gets a substitute teaching job at Flushing; and, after a short time there, they knock on his door and tell him, you can't teach here any more because of the* [*mandatory disclosure*]*, what it said about you; you can't teach here any more*.[10]

After deliberating, the jury returned a verdict in favor of plaintiff. On the verdict form, the jury found that plaintiff had proved that race was a factor in his termination and that plaintiff had shown $50,120 in past economic loss and $485,000 in future economic loss. The jury also found that plaintiff suffered emotional distress caused by his termination, but awarded nothing on that claim.

Shortly thereafter, defendant filed a motion for JNOV, a new trial, or remittitur. In its motion for JNOV, defendant asserted that plaintiff failed to present sufficient evidence to support his claim under the CRA. Defendant also argued that it was entitled to a new trial because the admission of evidence of the mandatory disclosures, despite the immunity granted by law, was inconsistent with substantial justice, and that the jury's verdict for future damages was unsupported by the evidence presented at trial. The trial court denied defendant's motion.

---

failed to preserve the issue for review by this Court.

[10] Emphasis added.

Defendant appealed in the Court of Appeals, which affirmed the trial court judgment in a split, unpublished opinion.[11] The majority held that plaintiff had presented sufficient direct evidence of discrimination, in the form of Caine-Smith's statement to Weaver.[12] Additionally, the majority held that the *McDonnell Douglas*[13] burden-shifting approach is inapplicable on appellate review, not only where, as here, direct evidence is offered, but also in general once the matter has been decided by a jury.[14] The majority further held that, even if *McDonnell Douglas* were applicable, plaintiff had presented sufficient circumstantial evidence to prevail under the *McDonnell Douglas* framework.[15] Finally, the majority held that the trial court did not err by allowing the presentation of evidence of defendant's mandatory disclosures to the jury.[16]

In dissent, Judge WILDER would have held that plaintiff failed to present any direct evidence of discrimination.[17] The majority and dissent differed in their

---

[11] *Hecht*, unpub op at 1.

[12] *Id.*, at 3-5. The panel relied on testimony from Weaver's deposition that was read into the record at trial. There was actually stronger testimony by Weaver, which we use in this opinion, that the Court of Appeals panel overlooked.

[13] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

[14] *Hecht*, unpub op at 5.

[15] *Id.* at 6-7. The Court of Appeals determined that plaintiff had presented sufficient evidence that he was treated differently than black employees who had made racial remarks, but were not punished. *Id.*

[16] *Id.* at 7-9.

[17] *Id.* (WILDER, J., dissenting), at 2.

understanding of a critical portion of Weaver's testimony. In that testimony, Weaver stated that Caine-Smith conveyed a message with the " 'point . . . that [racial banter] happens amongst African Americans and it's not the other way around[.]' " The dissent rejected the majority position that this statement was direct evidence of discrimination because it required an inference to prove the existence of Caine-Smith's discriminatory intent, and it could plausibly be interpreted as either discriminatory or benign.[18] The dissent also would have concluded that plaintiff could not prove a circumstantial case of discrimination because, even assuming plaintiff could establish a prima facie case as required by *McDonnell Douglas*, defendant clearly rebutted the inference of discrimination with legitimate reasons for plaintiff's discharge from employment.[19]

Defendant filed an application for leave to appeal the Court of Appeals decision. This Court granted leave to appeal, asking the parties to address

> whether the Court of Appeals erred: (1) when it found sufficient direct evidence of racial discrimination on the basis of a witness's interpretation or understanding of what the defendant's representative said to her; (2) when it concluded that the burden-shifting analysis of *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), was not applicable and that there was sufficient circumstantial evidence that the plaintiff was similarly situated to African-American employees who had made race-based remarks in the past; and (3) when it held that the trial court did not abuse its discretion in admitting evidence of the defendant employer's disclosures, which were mandated by MCL 380.1230b, to the plaintiff's prospective employers.[20]

---

[18] *Id*. at 2-5.

[19] *Id*. at 5-6. The dissent did not address MCL 380.1230b.

[20] *Hecht v Nat'l Heritage Academies, Inc*, 498 Mich 877 (2015).

14

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decisions regarding motions for JNOV.[21] "The appellate court is to review the evidence and all legitimate inferences in the light most favorable to the nonmoving party. Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted."[22] Issues relating to the admission of evidence are reviewed for an abuse of discretion.[23] An abuse of discretion generally occurs only when the trial court's decision is outside the range of reasonable and principled outcomes,[24] but a court also necessarily abuses its discretion by admitting evidence that is inadmissible as a matter of law.[25] Statutory interpretation is a question of law that we review de novo.[26]

## III. CIVIL RIGHTS ACT

This Court must determine whether the trial court erred by denying defendant's motion for JNOV,[27] that is, we must determine whether plaintiff presented sufficient

---

[21] *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 131; 666 NW2d 186 (2003).

[22] *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000).

[23] *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004).

[24] *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007).

[25] *Craig*, 471 Mich at 76.

[26] *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 309; 645 NW2d 34 (2002).

[27] Despite defendant's current arguments before this Court regarding the trial court's denial of its motion for directed verdict, we agree with the Court of Appeals majority that defendant did not appeal in that Court the denial of its motion for directed verdict. The phrase "directed verdict" was mentioned only four times in defendant's Court of Appeals

evidence to support a jury verdict finding employment discrimination. Again, in reviewing a motion for JNOV we must construe all evidence and inferences from the evidence in the nonmoving party's favor,[28] and, "[i]f reasonable jurors could have honestly reached different conclusions, the jury verdict must stand."[29] To make this

---

brief and those references were cursory. These cursory statements did not adequately present for review the denial of the motion for directed verdict, particularly given that defendant filed its claim of appeal in the Court of Appeals "from the verdict returned on July 15, 2011, the Judgment entered on August 8, 2011, the Order Awarding Attorney Fees and Costs to Plaintiff entered on August 18, 2011, and the Order Denying Defendant's Motion [f]or JNOV, New Trial, or in the Alternative, Remittitur . . . ." This failure to mention the denial of its motion for directed verdict in its claim of appeal in the Court of Appeals was significant given the cursory references to the issue in defendant's Court of Appeals appellate brief. In its application for leave to appeal in this Court, defendant claims that it had "argued that the trial court erred by denying its motion for directed verdict and its JNOV motion." Defendant does not provide any support for this assertion beyond noting that the dissenting Court of Appeals judge "disagreed that [defendant] was not appealing the trial court's denial of its directed motion verdict [sic] in addition to the denial of its JNOV motion," and that "the standard of review for both was the same." This is insufficient to adequately present the directed verdict issue in this Court. See *Goolsby v Detroit*, 419 Mich 651, 655 n 1; 358 NW2d 856 (1984). Because the issue is not properly before us, we will not address defendant's directed verdict claims.

[28] *Wilkinson*, 463 Mich at 391.

[29] *Morinelli v Provident Life & Accident Ins Co*, 242 Mich App 255, 260-261; 617 NW2d 777 (2000). In other words, unless a plaintiff's case is wholly lacking evidence on an element of a claim, the jury is allowed to make reasonable inferences from the evidence and make credibility determinations. This is entirely consistent with our canon that credibility determinations lie solely with the trier of fact. See *Moll v Abbot Laboratories*, 444 Mich 1, 47; 506 NW2d 816 (1993) (LEVIN J., dissenting) ("It is well settled as a matter of both Michigan and federal civil procedure that it is for the trier of fact, generally the jury, to decide where reasonable persons can draw different inferences from undisputed facts."); *Vandenberg v Prosek*, 335 Mich 382, 386; 56 NW2d 227 (1953) ("The weight that is to be given to the testimony of the witnesses is largely a matter to be left to the judgment of the jurors. While some of the witnesses' testimony, if believed, would indicate that plaintiff had been contributorily negligent, the jurors might give this

16

assessment, we must determine what a plaintiff is required to prove in an employment discrimination case.

MCL 37.2202(1) of the CRA provides:

> An employer shall not do any of the following:
>
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, *because of* . . . race . . . .[30]

The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination.[31] In our caselaw, we have interpreted the CRA to require " 'but for causation' or 'causation in fact.' "[32] We reaffirm that construction here.

There are multiple ways to prove that a plaintiff was the victim of unlawful discrimination. Direct evidence of intentional discrimination is a sure but rare method of challenging an employer's decision.[33] In this case, plaintiff did not have direct evidence

---

testimony such credence as they found it should have, under the circumstances, and in view of testimony to the contrary as to the essential facts.").

[30] Emphasis added. "MCL 37.2202(1)(a) draws no distinctions between 'individual' plaintiffs on account of race." *Lind v Battle Creek*, 470 Mich 230, 232; 681 NW2d 334 (2004).

[31] *Reeves v Sanderson Plumbing Prod, Inc*, 530 US 133, 153; 120 S Ct 2097; 147 L Ed 2d 105 (2000).

[32] *Matras v Amoco Oil Co*, 424 Mich 675, 682; 385 NW2d 586 (1986).

[33] The rarity of direct evidence in discrimination cases is one justification Courts have offered for the creation of the *McDonnell Douglas* paradigm. See, e.g., *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001) ("In many cases . . . no direct

of discrimination.[34]  But there remain multiple ways of proving the ultimate question of

evidence of impermissible bias can be located."); *US Postal Serv Bd of Governors v Aikens*, 460 US 711, 716; 103 S Ct 1478; 75 L Ed 2d 403 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."); *Kline v Tennessee Valley Auth*, 128 F3d 337, 348 (CA 6, 1997) ("It is the rare situation when direct evidence of discrimination is readily available, thus victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof.").

[34] Perhaps the best *general* definition of direct evidence is that it is evidence that proves impermissible discriminatory bias without additional inference or presumption.  See *Hazle*, 464 Mich at 462.  Nor did Caine-Smith's statement have all of the hallmarks that surrounded the statement in *DeBrow v Century 21 Great Lakes, Inc (After Remand)*, 463 Mich 534, 538; 620 NW2d 836 (2001)—a statement made by a decision-maker, to the plaintiff, at the meeting in which the plaintiff suffered the adverse employment decision, and evincing a causal nexus (stating the plaintiff was " 'getting *too old* for this s[***]' "). (Emphasis added.)

Whether Weaver's testimony about Caine-Smith's acknowledgement of the unequal application of defendant's antidiscrimination workplace policies constituted direct evidence of discrimination was a point of major dispute between the Court of Appeals majority and dissent.  The majority erred by relying on the wrong section of Weaver's testimony, wherein Weaver seemed to be speculating about Caine-Smith's view that it was acceptable to give black employees engaging in prohibited racial banter a pass under the defendant's antidiscrimination polices.  Weaver testified that she *thought* Caine-Smith's " 'point was that it happens amongst African Americans and it's not the other way around; and that this one was reported.  Someone was offended and we had an obligation to follow up on it.' "  That kind of speculative testimony about motivation may be circumstantial evidence but it is never direct evidence of motivation because, as Judge WILDER explained in his dissent, Weaver's testimony about what *she believed* Caine-Smith *meant* "is not direct evidence of discrimination because it did not recount an actual statement by Caine-Smith."  *Hecht* (WILDER, J., dissenting), unpub op at 3.  In other words, Weaver was merely making an *inference* about what Caine-Smith intended to convey to Weaver but Caine-Smith's actual words were not provided to the jury in this exchange.  To our knowledge, no court has accepted such speculative testimony as direct evidence of discrimination.

We conclude that even the Weaver testimony quoted later in this opinion (in

18

discrimination in a circumstantial evidence case.[35] A plaintiff can attempt to prove discrimination by showing that the plaintiff was treated unequally to a similarly situated employee who did not have the protected characteristic.[36] An employer's differing treatment of employees who were similar to the plaintiff in all relevant respects, except for their race, can give rise to an inference of unlawful discrimination.[37] In order for this type of "similarly situated" evidence alone to give rise to such an inference, however, our cases have held that the "comparable" employees must be "nearly identical" to the plaintiff in all relevant respects.[38]

Plaintiff argues that he was treated differently than similarly situated black employees at the school. He argues that the black employees routinely engaged in racial banter, but were not disciplined. Yet he was fired for what he claims is nearly identical conduct—telling a racially charged joke. If this were the entirety of plaintiff's case, we question whether it would be sufficient to sustain the verdict. Defendant points out several factors that arguably distinguish plaintiff's conduct from that of other employees,

---

which Weaver testified that Caine-Smith *said*, " 'It [the prohibited racial banter] happens among African-Americans and it's not the other way around' ") does not constitute direct evidence of racial bias. The Weaver testimony is, however, potent circumstantial evidence of the employer's potential racially biased decision-making, and ultimately, we conclude that there is sufficient *circumstantial* evidence to sustain this verdict.

[35] *Matras*, 424 Mich at 683-684.

[36] *Town v Mich Bell Tel Co*, 455 Mich 688, 695; 568 NW2d 64 (1997) (opinion by BRICKLEY, J.).

[37] *Id*. at 695-696.

[38] *Id*. at 699-700.

19

notably that plaintiff's joke was told in a classroom full of students, which certainly raised the prospect that they might hear it, regardless of whether they actually did.

We need not decide this question, however, because the jury was not left with *only* this evidence from which to draw the inference that race was the "but for" cause of plaintiff's discharge. Defendant errs when it suggests that there are only two ways in which a plaintiff may meet its ultimate burden of demonstrating circumstances from which the fact-finder could conclude that race discrimination occurred: by proving that the plaintiff was replaced by a person of another race or by using the "similarly situated" method. A plaintiff is not so limited.

As stated earlier, during trial, the jury was presented with testimony from both Unwin and Caine-Smith about defendant's employee conduct practices. Caine-Smith testified that defendant's employee handbook precluded "inappropriate business conduct, which includes gambling, abusive profanity or threatening language, insubordination, *or violation of discrimination or harassment policy*, misuse of confidential information, conducting personal business during work time, excessive absenteeism or tardiness, *showing disrespect for co-workers*, improper use of [defendant's] technology or [defendant's other] resources."[39] Unwin noted that defendant also had a workplace harassment policy, which stated that defendant was "committed to providing a work environment that's free from discrimination and unlawful harassment." Prohibited forms of harassment included any "verbal or physical conduct that insults or shows hostility or

---

[39] Emphasis added.

aversion toward an individual because of his or her race or color or any other legally protected characteristic." She highlighted that examples of harassing conduct include, but are not limited to, "epithets, slurs, [and] negative stereotyping." Further, Unwin stated that the school's zero-tolerance policy required anyone who sees any such misconduct to "immediately notify [his or her] manager," and that "[a]nyone engaging in . . . unlawful harassment will be subject to . . . disciplinary action up to and including termination from employment."[40]

Thus, defendant provided a nondiscriminatory rationale for disciplining plaintiff: violation of the school's employment policies. Despite these exacting rules dictating how harassing speech and negative racial stereotyping comments must be handled under defendant's policies, the jury was also presented with evidence that the rules were not strictly applied to black employees engaged in such prohibited conduct. Weaver, herself, testified that she was the subject of racial banter that could easily be described as "negative stereotyping" from black employees on multiple occasions, as well as having heard black employees use the " 'n' word" during her tenure at LCA. However, if there really were a zero-tolerance policy, the jury might well have thought it suspicious that none of those incidents involving black employees led her to follow the mandatory reporting requirement of defendant's policy, and none resulted in any escalation of punishment as occurred with plaintiff's violation.

---

[40] Quotation marks omitted.

The inference that black employees were excepted from enforcement of defendant's harassment policies could reasonably have been bolstered by plaintiff's testimony. Plaintiff testified that he heard one employee make a racially charged joke about a children's cartoon character[41] and another employee call a student to her side by saying " 'hey, come here light skinned.' " None of these instances of harassing conduct was ever met with reporting, investigation, or punishment by defendant.[42] And yet, when plaintiff engaged in conduct violative of defendant's policies, his misconduct was immediately reported and investigated, and plaintiff was ultimately terminated.[43]

Particularly significant in this case, the jury was provided with evidence from which it could reasonably conclude that defendant's own management decision-makers

---

[41] Plaintiff's testimony was corroborated by the testimony of that employee, Clarence Scott, a black employee, who admitted that he made this racially charged joke in front of numerous employees.

[42] It is true that plaintiff did not himself report these incidents, and defendant might, perhaps justifiably, take umbrage at plaintiff seeking to hold it accountable for episodes that it might not have known about because plaintiff himself did not report them. But the question is not whether plaintiff reported these incidents. It is whether the jury could reasonably use these incidents (along with others) to draw an inference of discrimination. The jury might have reasonably inferred here that such remarks among black employees were so widespread and so uniformly tolerated that any reporting would have been futile, or even that these comments, when made by black employees, simply were tolerated and not reported.

[43] It is important to note that these proofs challenge the credibility of defendant's nondiscriminatory defense and need not be considered elements of a "similarly situated" case, which we have held requires that "all of the relevant aspects of [the plaintiff's] employment situation were nearly identical to those of [the comparative employee's] employment situation." *Town*, 455 Mich at 699-700 (opinion by BRICKLEY, J.) (quotation marks omitted).

22

knew about and tolerated unequal enforcement of their policies. This trial provided the interesting situation wherein a defendant's *management* employees explained that they were aware of conduct among black employees that violated the defendant's zero-tolerance policy. This testimony could have allowed a reasonable jury to conclude that defendant applied a different standard based on race.

The critical testimony on this issue was offered by Weaver. On direct examination, plaintiff's counsel questioned Weaver as follows:

> [*Plaintiff's Counsel*]: . . . Under oath [during your deposition], I asked you this: "Did you tell Ms. Caine-Smith that a lot of people made racial jokes?"
>
> [*Weaver*]: I did not say a lot. I said it happened, and that's what's in my deposition.
>
> [*Plaintiff's Counsel*]: You said what happens?
>
> [*Weaver*]: That there were racial comments made, yes.
>
> [*Plaintiff's Counsel*]: Okay. So you told Linda Caine-Smith that when you talked to her November 3rd; right?
>
> [*Weaver*]: Yes.
>
> [*Plaintiff's Counsel*]: Okay. This is November 3rd, a few days before [plaintiff] was fired?
>
> [*Weaver*]: Um hmm. Yes.
>
> [*Plaintiff's Counsel*]: Now isn't it a fact that, when you said that, *Caine-Smith responded by saying, "It happens among African-Americans and it's not the other way around"; right?*
>
> [*Weaver*]: *Yes.*[44]

---

[44] Emphasis added.

Thus, the jury was shown an exchange between two of defendant's higher-level employees in which the dean, Weaver, reported to her supervisor, principal Caine-Smith, that conduct, which was at least some respects similar to that for which plaintiff was being investigated, routinely occurred at the school. Caine-Smith responded by not only acknowledging the racial inconsistency, but, the jury might have concluded, by condoning it as well.[45]

This point was further emphasized as Weaver's testimony continued:

> [*Plaintiff's Counsel*]: Okay. So there, a few days before [plaintiff] was fired, when you said to Caine-Smith racial jokes happen here, how Caine-Smith distinguished [plaintiff's] situation was that the racial jokes happened amongst African-Americans; right?
>
> [*Weaver*]: And that someone was offended, yes.
>
> * * *
>
> [*Plaintiff's Counsel*]: Okay. *So there was a distinction between Craig—there was a distinction Caine-Smith—Ms. Caine-Smith made between Craig and the other jokesters; and that distinction was racial; correct?*
>
> [*Weaver*]: No
>
> [*Plaintiff's Counsel*]: Well didn't Caine-Smith—
>
> [*Weaver*]: *Oh, you're saying because it—okay, I guess I could see where you would say that, yes.*
>
> [*Plaintiff's Counsel*]: Okay. *So you would agree that the fact that Craig is white and the fact that the other jokesters were African-American, that was a factor that Caine-Smith seemed to be considering, right?*

---

[45] The jury could have interpreted this testimony in any number of ways. But, keeping in mind that all evidence and inferences must be weighed in plaintiff's favor, *Wilkinson*, 463 Mich at 391, nothing precluded the jury from viewing the testimony in this manner.

[*Weaver*]: *That's what my statement says, yes.*

[*Plaintiff's Counsel*]: And that's the truth; isn't it?

[*Weaver*]: That's not—no, I believe it was more about the offensiveness.

[*Plaintiff's Counsel*]: *But race was still a factor?*

[*Weaver*]: *Race is a factor when it's a racial comment.*[46]

On this testimony the jury could reasonably find that race was a "but for" cause in the decision to investigate plaintiff and escalate the punishment for his racial comments.[47] This is true despite the arguable differences between plaintiff's racial comments and those of his black colleagues. Defendant argues that no reasonable inference of discrimination can be drawn here because plaintiff's jokes were told in a classroom and, in this case, someone was offended. These are certainly distinctions which, if credited by the jury, might reasonably have allowed it to find for defendant. But we note that when Weaver brought to Caine-Smith's attention the fact that "racial jokes happen here," Caine-Smith did not respond *only* by noting that in plaintiff's case someone was offended, or *at all* by saying that plaintiff's jokes were made in the presence of children. Instead, she responded by invoking race as a distinction. Taken together with the other evidence presented, a reasonable jury could infer that defendant violated the CRA, as evidenced by Weaver's apparent concession that race was involved in the decision.

---

[46] Emphasis added.

[47] *Matras*, 424 Mich at 682.

Nevertheless, defendant presented to the jury numerous nondiscriminatory reasons for its decision to terminate plaintiff's employment—evidence of plaintiff's multiple and inconsistent explanations for his in-classroom statement about his preference for white rather than brown tables, along with evidence that plaintiff had attempted to impede the investigations and had lied or been dishonest with Caine-Smith. These reasons, not race, defendant asserted, were the reasons why it decided to terminate plaintiff.

Plaintiff, however, presented sufficient evidence for a reasonable juror to reject as unbelievable these race-neutral reasons. The testimony of defendant's witnesses contained numerous inconsistencies. First, in contradiction of Weaver's testimony, Caine-Smith testified that Weaver never told her about the other racial comments made by black employees in the school. If the jury believed Weaver, it could reasonably have discredited Caine-Smith's testimony. Moreover, Unwin's admission that termination was a disciplinary option even before defendant became aware of any allegation of plaintiff's interference with the investigation could also have led the jury to conclude that plaintiff was being treated differently because of his race.

This conclusion is buttressed by plaintiff's positive teaching record at the school and the fact that defendant chose the highest form of punishment, termination, for a first offense, without even speaking with plaintiff to obtain his version of his postsuspension discussion with Bell.[48] While the employee handbook allows for termination for a first

---

[48] Unwin testified that some offenses are "so serious that following a thorough investigation they could result in corrective action up to and including termination from employment for the first offense."

offense, Unwin testified that the decision to terminate is normally dependent "on certain factors, including, but not limited to, the seriousness of the violation and whether it is a first time violation or a recurrence." She also testified that such a termination would "follow[] a thorough investigation . . . ." Unwin also acknowledged plaintiff's "good record" concerning race relations while working for defendant, and that plaintiff had never before committed misconduct. In closing arguments, plaintiff's counsel highlighted these facts, arguing that "it just wasn't reasonable to fire a person for this offense after such a perfect record, after such a record of good faith and fairness and respect in racial matters." Given this, plaintiff's counsel further argued, defendant "fails on the reasonableness test; and, if [defendant] did not act reasonably, something else was afoot, something else was going on . . . ." While a jury may not second-guess an employer's business decisions, and was in no way required to draw the inferences suggested by plaintiff's counsel, a reasonable jury could have used these facts to support a finding of discrimination.

With respect to the claim that plaintiff interfered with defendant's investigation, Unwin admitted that plaintiff never explicitly asked Bell to lie, though she still believed he was asking Bell to lie. And the jury heard evidence that defendant did not even speak with plaintiff regarding his postsuspension discussion with Bell. Defendant only spoke with plaintiff about the initial incident, not about the subsequent allegations of interference, and terminated him after his first offense, despite his otherwise "good" record.

Of its varying rationales for terminating plaintiff, only one—the fact that plaintiff's racial banter occurred around students—was based on information that

27

defendant received before deciding to investigate plaintiff's wrongdoing and escalate to warnings that suspension and termination could occur as a result.[49] Like each of the other nondiscriminatory reasons provided by defendant, plaintiff disputed, albeit inconsistently, the accuracy of this allegation, claiming that none of the students was within earshot when he made his statement.

When considering this evidence as a whole, and by making all reasonable inferences in favor of plaintiff, a reasonable juror could have disbelieved defendant's race-neutral reasons for plaintiff's termination and have believed instead that consideration of his race was the cause.

The jury, as the trier of fact and deliberative body charged to make credibility determinations, could have determined that the statements of Weaver and Caine-Smith established that race was a "but for" cause of their decision-making concerning plaintiff. That testimony, along with the evidence that defendant had a zero-tolerance policy, which required reporting, investigation, and punishment of all forms of negative racial stereotyping, that it failed to apply when black employees violated the policy, in addition to the speed with which defendant terminated plaintiff, was sufficient to allow a reasonable jury to conclude that race was the real reason defendant fired plaintiff.

Because, when assessing a motion for JNOV we are required "to review the evidence and all legitimate inferences in the light most favorable to the nonmoving

---

[49] In fact, plaintiff had already been suspended pending the remainder of defendant's investigation *before* he allegedly tried to interfere with the investigation by contacting Bell and Code.

party,"[50] we conclude that there was sufficient evidence of discriminatory intent before the jury.  The jury's verdict, finding a violation of the CRA, was supported by the totality of the evidence presented.[51]

IV.  MCL 380.1230b

Because we conclude that plaintiff did present sufficient evidence to support the jury's ultimate finding of discrimination, we must next decide whether the trial court acted contrary to MCL 380.1230b, by admitting evidence that defendant reported plaintiff's misconduct to his prospective employers.

Generally, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, the[] rules [of evidence], or other rules adopted by the Supreme Court.  Evidence which is not relevant is not admissible."[52]   Evidence may also be precluded by statute.[53]   MCL 380.1230b is such a statute.

MCL 380.1230b provides, in pertinent part:

> (1) Before hiring an applicant for employment, a school district, local act school district, public school academy, intermediate school district, or nonpublic school *shall request the applicant for employment to sign a statement that does both of the following*:

---

[50] *Wilkinson*, 463 Mich at 391.

[51] See *Morinelli*, 242 Mich App at 260-261 ("If reasonable jurors could have honestly reached different conclusions, the jury verdict must stand.").

[52] MRE 402; see also *Waknin v Chamberlain*, 467 Mich 329, 333; 653 NW2d 176 (2002).

[53] *People v Layher*, 464 Mich 756, 761; 631 NW2d 281 (2001).

(a) *Authorizes the applicant's current or former employer or employers to disclose to the school district . . . any unprofessional conduct by the applicant*[54] *and to make available to the school district,* local act school district, public school academy, intermediate school district, or nonpublic school *copies of all documents in the employee's personnel record maintained by the current or former employer relating to that unprofessional conduct.*

(b) *Releases the current or former employer, and employees acting on behalf of the current or former employer, from any liability for providing information described in subdivision (a),* as provided in subsection (3), and waives any written notice required under section 6 of the Bullard-Plawecki employee right to know act . . . .[55]

(2) Before hiring an applicant for employment, a school district, local act school district, public school academy, intermediate school district, or nonpublic school shall request at least the applicant's current employer or, if the applicant is not currently employed, the applicant's immediately previous employer to provide the information described in subsection (1)(a), if any. The request shall include a copy of the statement signed by the applicant under subsection (1).

(3) Not later than 20 business days after receiving a request under subsection (2), an employer shall provide the information requested and make available to the requesting school district, local act school district, public school academy, intermediate school district, or nonpublic school copies of all documents in the employee's personnel record relating to the unprofessional conduct. *An employer, or an employee acting on behalf of the employer, that discloses information under this section in good faith is immune from civil liability for the disclosure. An employer, or an employee acting on behalf of the employer, is presumed to be acting in good faith at*

---

[54] The statute defines "unprofessional conduct" as "1 or more acts of misconduct; 1 or more acts of immorality, moral turpitude, or inappropriate behavior involving a minor; or commission of a crime involving a minor. A criminal conviction is not an essential element of determining whether or not a particular act constitutes unprofessional conduct." MCL 380.1230b(8)(b).

[55] Plaintiff executed the statutory release before defendant provided any information to plaintiff's prospective employers.

*the time of a disclosure under this section* unless a preponderance of the evidence establishes 1 or more of the following:

(a) That the employer, or employee, knew the information disclosed was false or misleading.

(b) That the employer, or employee, disclosed the information with a reckless disregard for the truth.

(c) That the disclosure was specifically prohibited by a state or federal statute.[56]

Review of the plain language of this statute shows that it does three important things pertinent to this appeal: (1) it *requires* the applicant's current or former employer or employers to disclose to another school district any unprofessional conduct by the applicant;[57] (2) it *requires* an applicant for a teaching job to "[r]elease[] the current or former employer, and employees acting on behalf of the current or former employer, from any liability for providing [the] information";[58] and (3) it provides that an employer who discloses information in good faith "is immune from civil liability for the disclosure."[59] The statute, however, does not define the term "liability."

Plaintiff did not argue that defendant's disclosures were false or misleading, recklessly disregarded the truth, or otherwise violated state or federal statutes.[60] Plaintiff

---

[56] Emphasis added.

[57] MCL 380.1230b(3).

[58] MCL 380.1230b(1)(b).

[59] MCL 380.1230b(3).

[60] Under MCL 380.1230b(3)(a) through (c), an employer that discloses the information in good faith has unqualified immunity from civil liability for the disclosure. The employer is presumed to be acting in good faith unless the evidence establishes one of the

31

does contend that "liability" in MCL 380.1230b(3) refers to the *claim* for which a plaintiff is seeking recovery. In other words, plaintiff argues he is not precluded from presenting evidence of the mandatory disclosure because he did not sue for the disclosure itself—he sued for a violation of the CRA and presented evidence of the adverse impact of the disclosure to establish future damages. Plaintiff's belief is that only a direct action for the disclosure, e.g., a defamation claim, is precluded by this statute, but the admission of evidence of the disclosures in a case such as this is permissible.[61] On the other hand,

---

following:

> (a) That the employer, or employee, knew the information disclosed was false or misleading.

> (b) That the employer, or employee, disclosed the information with a reckless disregard for the truth.

> (c) That the disclosure was specifically prohibited by a state or federal statute.

An employee can challenge the employer's disclosures by presenting evidence to satisfy MCL 380.1230b(3)(a), (b), or (c), which then, and only then, operates to remove the good-faith presumption that entitles the employer to immunity. Because plaintiff has not pursued a challenge to defendant's immunity under MCL 380.1230b(3)(a), (b), or (c), defendant is entitled to unqualified immunity because it is presumed to have acted in good faith. We further note that this provision demonstrates that the Legislature did not foreclose plaintiffs from introducing evidence of an employer's disclosures in certain circumstances, but plaintiffs are permitted to do so only after establishing that the disclosures were made in bad faith.

[61] The dissent makes a related, ostensibly compelling, argument: liability and damages are separate concepts as exemplified by the fact that we routinely bifurcate trial into liability and damage segments. There is just one problem with this argument. While we can conceptually analyze damages issues independently of liability questions, there can be no damages without liability. Period. A legislative decision completely to preclude liability necessarily precludes damages on that same basis. The dissent's position is anchored in the argument that the "civil immunity" granted by the statute depends on the

32

defendant argues that plaintiff's position would eviscerate the protection provided by the statute and is clearly in contravention of the Legislature's expressed intent, as evidenced by the broad language of immunity it provided.

Dictionary definitions of the term "liability" support defendant's conclusion.[62] *Black's Law Dictionary* (10th ed) defines "liability" as "1. The quality, state, or condition of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment . . . . 2. A financial or pecuniary obligation in a specified amount . . . ."[63] More relevant, it further defines "civil liability" as "1. Liability imposed under the civil, as opposed to the criminal, law. 2. The quality, state, or condition of being *legally obligated for civil damages*."[64] Applying these

---

*source* of the liability. We see no textual support for the dissent's view that immunity under the statute depends on the claim underlying the liability.

[62] "An undefined statutory term must be accorded its plain and ordinary meaning. A lay dictionary may be consulted to define a common word or phrase that lacks a unique legal meaning. A legal term of art, however, must be construed in accordance with its peculiar and appropriate legal meaning." *Brackett v Focus Hope, Inc*, 482 Mich 269, 276; 753 NW2d 207 (2008) (citations omitted). If the definitions are the same in both a lay dictionary and legal dictionary it is unnecessary to determine whether the phrase is a term of art and it does not matter to which type of dictionary this Court resorts. *Id*.

[63] Emphasis omitted.

[64] *Black's Law Dictionary* (10th ed), p 1054 (emphasis altered). Lay dictionaries are similarly uniform with their definitions of "liability" and consistent with the legal definition. See, e.g., *The American Heritage Dictionary* (2d College ed) (defining "liability" as "[t]he state of being liable. . . . Something for which one is liable; an obligation or debt"); *Merriam-Webster's Collegiate Dictionary* (11th ed) (defining "liability" as "the quality or state of being liable" and as "something for which one is liable; [especially] : pecuniary obligation"). These lay dictionaries do not define "civil liability."

33

definitions of "liability" and "civil liability" to the statutory language, it is clear that the statute is sufficient in scope to preclude admission of the disclosure evidence.[65]  The admission of evidence and argument regarding the mandatory disclosures for the purpose of assessing damages allowed the jury to impose against defendant legal obligations arising from the disclosure.  The trial court was required to enforce the broad grant of immunity against civil liability for these disclosures that the Legislature provided to defendant, and the trial court's decision to admit this evidence violated MCL 380.1230b.

Additionally, this Court has previously interpreted the term "liability" and other liability-limiting statutes in a manner generally consistent with defendant's position.  In *Hannay v Transp Dep't*, this Court held that the phrase "liable for bodily injury" contained in the vehicle exception to governmental immunity,[66] means being "*legally responsible for damages flowing from* a physical or corporeal injury to the body."[67]  This Court thus interpreted the statutory phrase to permit recovery of economic and noneconomic damages arising from "bodily injury."[68]  In MCL 380.1230b, the Legislature included no such limiting language (e.g., "bodily injury"), requiring simply

---

[65] See also *Mayfield v First Nat'l Bank of Chattanooga*, 137 F2d 1013, 1019 (CA 6, 1943) ("Liability is a broad legal term which is usually held to include every kind of legal obligation, responsibility or duty, certainly all that are measured by money obligation.").

[66] MCL 691.1405 ("Governmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is an owner . . . .").

[67] *Hannay v Transp Dep't*, 497 Mich 45, 51; 860 NW2d 67 (2014) (emphasis added).

[68] See *id*.

that the job applicant release former employers from "*any* liability"[69] and granting immunity from "civil liability" to the former employer.[70] Thus, in accordance with the definition of "liable" used in *Hannay*, defendant is not "legally responsible for damages flowing from"[71] the mandatory disclosure.

Another decision of this Court, *In re Bradley Estate*,[72] is also helpful in deciding the instant case. In *Bradley Estate*, the petitioner became concerned about her brother's mental health and successfully petitioned the probate court for his hospitalization, averring that her brother was a danger to himself and his family.[73] After the probate court granted the petitions, which stated that a " 'peace officer shall take [the brother]

---

[69] MCL 380.1230b(1)(b).

[70] MCL 380.1230b(3).

Contrary to the dissent, we do not believe that *Henry v Dow Chem Co*, 473 Mich 63; 701 NW2d 684 (2005), requires the opposite conclusion. In that case, the Court merely held that a plaintiff is required to prove an *actual injury* to person or property in order to prevail on a negligence claim, despite the fact that the elements of a negligence action are routinely noted as "(1) duty, (2) breach, (3) causation, and (4) damages." *Id*. at 74. In other words, the damages sought in a negligence action must necessarily flow from an actual injury. But this distinction between "injury" and "damages" has no bearing on whether one can have damages without liability. As discussed, the plain language of MCL 380.1230b(3), unlike the elements of a negligence claim, contains no injury requirement. Therefore, our holding that the Legislature's provision of "immun[ity] from civil liability for the disclosure," MCL 380.1230b(3), extends to preclude damages based on the disclosure, is simply unaffected by *Henry*'s discussion of injury in the negligence context.

[71] *Hannay*, 497 Mich at 51, 60-62.

[72] *In re Bradley Estate*, 494 Mich 367, 372; 835 NW2d 545 (2013).

[73] *Id*.

35

into protective custody and transport him . . . to [a community mental health contract facility],' " the petitioner immediately submitted the order to the respondent sheriff's department.[74]  The respondent sheriff's department failed to execute the court order, and nine days after the probate court order was entered, the brother committed suicide.[75]

The petitioner, acting as personal representative for her brother's estate, filed a lawsuit in circuit court against the sheriff's department for wrongful death, alleging gross negligence.  The petitioner's claim was dismissed on governmental immunity grounds.[76]  The petitioner did not appeal this dismissal, instead filing a petition for civil contempt in the original probate court, arguing that the sheriff's office violated the court's order and that the sheriff's misconduct constituted contempt for which she was entitled to indemnification damages.[77]  The sheriff's department again argued that governmental immunity barred the suit, but the probate court denied the motion for summary disposition, holding that " '[g]overnmental immunity does not insulate a contemnor from the contemnor's refusal or negligence to obey a court order.' "[78]  The sheriff's department appealed in the circuit court, which reversed and remanded to the probate court for entry of an order granting summary disposition in favor of the sheriff's

---

[74] *Id*. at 372-373.

[75] *Id*. at 373.

[76] *Id*. at 373-374.

[77] *Id*. at 374.

[78] *Id*. at 374-375 (alteration in original).

department because the circuit court concluded that the petitioner's claim was based in tort and barred by governmental immunity.[79] The Court of Appeals reversed the circuit court and held that the governmental tort liability act (GTLA) does not immunize governmental agencies from " 'tort-like' " damages in a contempt suit, even though the underlying facts " 'could have also established a tort cause of action . . . .' "[80]

On appeal, this Court reversed the Court of Appeals. We held that the language in MCL 691.1407(1), stating that governmental agencies are immune from "tort *liability*,"[81] meant that governmental agencies were immune from "all legal responsibility arising from a noncontractual civil wrong for which a remedy may be obtained in the form of compensatory damages."[82] In reaching that conclusion, this Court held that, "[a]s commonly understood, the word 'liability,' refers to liableness, i.e., 'the state or quality of being liable.' To be 'liable' means to be 'legally responsible[.]' Construing the term liability along with the term 'tort,' it becomes apparent that the Legislature intended 'tort liability' to encompass legal responsibility arising from a tort."[83]

*Bradley Estate* supports our construction of MCL 380.1230b and our conclusion that the disclosure evidence should not have been admitted. Though plaintiff's lawsuit

---

[79] *Id*. at 375.

[80] *Id*. at 375-376.

[81] MCL 691.1407(1) (emphasis added).

[82] *Bradley Estate*, 494 Mich at 385.

[83] *Id*. (citations omitted; second alteration in original).

clearly raises a claim under only the CRA, the admission of evidence and argument regarding the mandatory disclosures for the purpose of assessing damages allowed the jury to impose on defendant "legal responsibility arising from" the disclosure.[84] That is what the language of MCL 380.1230b(3) expressly precludes. As this Court noted in *Bradley Estate*, the label of the action does not control.[85] The statute here clearly provides that no liability—meaning "all legal responsibility arising from a . . . civil wrong"[86]—may come from the disclosures. The main difference between *Bradley Estate* and the instant case is that the Legislature's intended scope of immunity is even broader under MCL 380.1230b. The Legislature did not limit the *type* of civil liability from which school employers are immune for their mandatory disclosures. Instead, it provided blanket protection from all civil liability.[87] Given the plain language of the statute and our prior caselaw, we conclude that the trial court clearly erred by admitting this evidence. Its use at trial violated the statutory immunity for disclosing schools by allowing the jury to base damages on the disclosures.

---

[84] *Id*.

[85] *Id*. at 386-387 ("Petitioner and the Court of Appeals interpret this passage from [*Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 647-648; 363 NW2d 641 (1984),] to mean that the label of the action controls in determining whether an action imposes tort liability and that, if the claim is not a traditional tort, then the GTLA is inapplicable and 'tort-like' damages are recoverable. *Ross*, however, made no such pronouncement and did not consider the meaning of 'tort liability,' which is the question that is now before this Court. Instead, consistent with our holding in this case, *Ross* merely recognized that the GTLA does not bar a properly pleaded contract claim.").

[86] *Bradley Estate*, 494 Mich at 385.

[87] MCL 380.1230b(3).

We are left with one view of the statute—plaintiff was not allowed to present evidence concerning the effect of the disclosures to the jury, because, contrary to the Legislature's prohibition, that admission permitted the jury to attribute liability to defendant flowing from the disclosure.[88] The fact that the liability here is expressed in terms of damages plaintiff suffered as a result of the disclosures does not negate the fact that the defendant is being held civilly liable for the statutorily mandated disclosures. The trial court erred by allowing plaintiff to present this evidence to the jury in light of the language of MCL 380.1230b(3). This error tainted the jury's entire future damages award.[89] We therefore vacate the jury's award of future damages.

---

[88] The breadth of the immunity afforded by this statute is underscored by the fact that the Legislature provided both complete civil immunity for disclosures and required that all new employees sign a statement that releases the school district from "*any* liability for providing information" concerning the employee's unprofessional conduct to other school districts. MCL 380.1230b. As noted, plaintiff signed this statutory release before defendant provided the disclosures to prospective employers. This belt and suspenders approach to protecting the school districts of this state is a clear indication of the Legislature's intent to preclude the type of liability imposed on defendant in this case. Defendant fulfilled its statutorily required duties under the statute and cannot be held liable therefor. Furthermore, even if we were to accept plaintiff's interpretation of the statute, at least one of the release forms plaintiff signed pursuant to MCL 380.1230b(1)(b), provided that plaintiff would "release and hold harmless" defendant for any civil or criminal liability for providing information to prospective employers. Arguably, this release form would preclude plaintiff from receiving any remuneration from defendant for the disclosures. See *Black's Law Dictionary* (10th ed) (defining "hold harmless" as "[t]o absolve (another party) from any responsibility for damage or other liability arising from the transaction").

[89] Defendant argued in its motion for JNOV, that "the jury's award of *future* economic losses" was excessive and based on the erroneous admission of defendant's statutorily required disclosures. (Emphasis added.) As previously noted, the jury provided an itemized verdict with $485,000 in future damages. Because the trial court permitted the jury to base these future damages on the mandatory disclosures, contrary to MCL

## V. CONCLUSION

While the Court of Appeals erred by holding that plaintiff had presented sufficient direct evidence of discrimination to sustain the jury verdict, the Court of Appeals correctly held that defendant presented sufficient circumstantial evidence of discrimination to sustain the jury's verdict. The trial court erred, however, by admitting evidence of defendant's mandatory disclosures of plaintiff's unprofessional conduct because MCL 380.1230b provides complete immunity for those disclosures, and the Court of Appeals erred by upholding the admission of that evidence. For these reasons, we reverse in part the judgment of the Court of Appeals, vacate the jury award for future damages, and remand this case to the trial court for further proceedings consistent with this opinion.

Robert P. Young, Jr.
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack (as to Parts I, II, and III)
David F. Viviano
Richard H. Bernstein (as to Parts I, II, and III)
Joan L. Larsen

---

380.1230b(3) ("An employer . . . that discloses information under this section in good faith is immune from civil liability for the disclosure."), this award cannot stand as a matter of law.

40

STATE OF MICHIGAN

SUPREME COURT

CRAIG HECHT,

      Plaintiff-Appellee,

v                               No. 150616

NATIONAL HERITAGE ACADEMIES,
INC.,

      Defendant-Appellant.

_____

MCCORMACK, J. (*concurring in part and dissenting in part*).

I agree with the majority that the plaintiff presented sufficient evidence of discrimination such that the trial court did not err by denying the defendant's motion for judgment notwithstanding the verdict. But I respectfully dissent from the majority's decision to vacate the jury award for future damages. I do not agree that the defendant's disclosures of the plaintiff's unprofessional conduct subjected the defendant to any "civil liability for the disclosure," which I agree MCL 380.1230b(3) would bar. No, the defendant incurred all its civil liability in this case when it discharged the plaintiff on the basis of race in violation of the Civil Rights Act (CRA), MCL 37.2101 *et seq*. The jury established that fact through its verdict in the plaintiff's favor. The jury's consideration of the defendant's disclosures merely provided the basis for the jury to determine the extent of the plaintiff's *damages*, a very different question from the issue of the defendant's *liability*.

## I.  MCL 380.1230b

As the majority observes, MCL 380.1230b(3) immunizes an employer from "civil liability" for disclosing information in good faith to a potential school employer about an employee's unprofessional conduct.  As I see it, there are two ways that an employer might theoretically demonstrate that an employee seeks to hold it civilly liable for its disclosure of the employee's unprofessional conduct to potential employers, thereby entitling it to immunity under MCL 380.1230b.

First, the employer could show that the employee is suing it for an actual injury caused by the disclosure and resultant damages—in a cause of action for defamation, for example.  No one suggests that is the case here, given that the plaintiff sued for a completely different injury—a discriminatory discharge under the CRA.

Second, the employer can show that the plaintiff's separate action, arising from a violation of the CRA in this case, is attempting to hold it civilly liable for its disclosures under MCL 380.1230b by, as the plaintiff in this case describes it, "enhanc[ing] [the] damages," through the introduction of evidence of harm caused by the disclosures.  The majority accepts this second theoretical basis for granting immunity under MCL 380.1230b.  The majority reasons that our recent decisions discussing "liability" as including legal responsibility for damages flowing from an injury support the conclusion that allowing the plaintiff to recover damages established by introducing the defendant's disclosures into evidence effectively subjects the defendant to more damages, and by extension, more liability.  I disagree with this reasoning.

2

The defendant's argument is flawed because it rests on the fundamentally faulty premise that the introduction of evidence of its disclosures increased the defendant's liability because it increased the plaintiff's damages. The majority relies on dictionary definitions of the word "liability" and our decisions in *Hannay v Transp Dep't*, 497 Mich 45; 860 NW2d 67 (2014), and *In re Bradley Estate*, 494 Mich 367; 835 NW2d 545 (2013), to support its conclusion that the statute precludes the plaintiff from introducing the disclosures into evidence to prove his future damages. I respectfully disagree. Liability and damages are related, of course, but they are not the same thing. One illustration of this fact is our courts' common practice of bifurcating proceedings on these two issues, conducting a liability phase followed by a damages phase. See, e.g., *Adama v Doehler-Jarvis, Div of N L Indus, Inc (On Remand)*, 144 Mich App 764, 767; 376 NW2d 406 (1985).

Disclosing the plaintiff's unprofessional conduct did not create additional legal responsibility for which the defendant was on the hook; rather, it was the alleged illegal act of discharging the plaintiff based on his race that gave rise to all the defendant's liability, i.e., its legal responsibility arising from a wrongful action. The injury from which the liability arose was the discriminatory discharge, not the disclosures. Introducing evidence of the defendant's disclosures of the plaintiff's conduct merely assisted the jury in determining the appropriate *remedy* for the discriminatory discharge. Put differently, evidence of the disclosures helped the jury determine the appropriate amount of damages for which the defendant was legally responsible because of its discriminatory conduct. See, e.g., *Bradley Estate*, 494 Mich at 397 (holding that "tort liability" includes "all legal responsibility arising from noncontractual civil wrongs *for*

3

*which a remedy may be obtained in the form of compensatory damages*") (emphasis added).

This conclusion is entirely consistent with the dictionary definitions of the word "liability" cited by the majority and with dictionary definitions of the word "damages." The defendant's liability, i.e., the defendant's "quality, state, or condition of being legally obligated" for damages was triggered by the allegedly discriminatory decision to terminate the plaintiff's employment. *Black's Law Dictionary* (10th ed). "Damages" are defined as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury[.]" *Black's Law Dictionary* (7th ed).

MCL 380.1230b(3) confers immunity from *liability*, in other words, the state of being legally obligated for damages, "for the disclosure," not from paying money as compensation for a state of legal responsibility unrelated to the disclosure. Because the statutory immunity is tied to the liability not the remedy, I agree with the plaintiff that MCL 380.1230b(3) only precludes imposing liability (and damages flowing therefrom) on a defendant when the liability arises from an injury caused by the disclosure itself.

This Court's decision in *Hannay* further supports my analysis. In *Hannay*, 497 Mich at 64, we observed that " 'damages' and 'injury' are not one and the same— damages *flow from* the injury." Because the damages flow from the injury, and the injury in this case is the discriminatory discharge, evidence of the disclosures did not impose any additional liability on the defendant.

*Bradley Estate*, 497 Mich 367, is largely inapposite here. That case involved a determination whether the plaintiff was seeking to impose "tort liability" on the defendant by bringing an action for civil contempt. This Court answered the question in

4

the affirmative.  But the central question in that case was whether the plaintiff's action for civil contempt constituted a "tort" suit; there was no dispute that if the answer to that question was yes, the governmental tort liability act , MCL 691.1401 *et seq.*, barred *both* liability and (necessarily) damages.  The defendant in this case does not assert that the plaintiff's CRA claim is barred by MCL 380.1230b(3) or that the jury's determination that the defendant was *liable* for employment discrimination was improper under the statute; the sole issue is whether the admission of the defendant's disclosures to allow the jury to determine the proper amount of damages constituted "civil liability for the disclosure" under MCL 380.1230b(3).

This Court's decision in *Henry v Dow Chem Co*, 473 Mich 63; 701 NW2d 684 (2005), is far more helpful than *Bradley Estate* or *Hannay*.  *Henry* instructs that a plaintiff must establish an actual injury before damages can be established, that the two are distinct, and that damages flow from the injury.  *Henry*, 473 Mich at 75.  As explained, disclosure of a school employee's unprofessional conduct is not an injury giving rise to damages unless the plaintiff seeks to hold the defendant liable "for the disclosure" itself.  MCL 380.1230b(3).  This conclusion is confirmed if one considers what could have happened if the trial court had barred evidence of the defendant's disclosures. The plaintiff could presumably have introduced other evidence showing that he applied for but was unable to obtain other teaching jobs, and the jury could have returned a verdict for exactly the same amount of damages on that basis.[1]  The entirety of

---

[1] In fact, the plaintiff had to introduce such evidence.  See *Morris v Clawson Tank Co*, 459 Mich 256, 264; 587 NW2d 253 (1998) (stating that the victim of a discriminatory

5

the defendant's liability emanates from the discriminatory discharge, not the disclosures. Damages determined as a result of the disclosures did not expose the defendant to any additional legal responsibility; instead the disclosures simply illustrated the harm for which the plaintiff sought a remedy. The defendant had already incurred legal responsibility for that harm by discriminatorily discharging the plaintiff.

The defendant's argument, while containing some surface appeal in its simplicity, amounts to this fallacy: the admission into evidence of the disclosures increased the plaintiff's damages, and liability is defined to include damages, so the disclosure exposed the defendant to greater liability from which it is immune. But this is contrary to *Henry*; one must demonstrate an actual injury before damages can be assessed, and the defendant's attempt to work backward from the alleged "enhanced damages" from the disclosures to a new injury in the disclosures is contrary to *Henry*. In short, one cannot use damages to establish injury.[2] Because damages all "*flow from* the injury," *Hannay*, 497 Mich at 64, and not the other direction, the defendant's underlying premise that the disclosures somehow increased the liability from the discriminatory discharge is incorrect.

---

discharge must mitigate his or her damages by making reasonable efforts to find new employment).

[2] The majority contends that *Henry* is not helpful here because its distinction between "injury" and "damages" says nothing about liability. But an injury is precisely what gives rise to liability (and resulting damages) in the first place; one does not typically incur legal responsibility for benign conduct. Because the two are inextricably linked, the majority's observation that the statute contains no injury requirement is, in my view, beside the point.

Had the Legislature intended the result reached by the majority, it could have expressed that intent much more plainly by stating that an employer that discloses information in good faith under the statute is immune from any damages established by the disclosure. Alternatively, it could have simply said that evidence of an employer's good faith disclosure under the statute is not admissible in a civil proceeding to establish a plaintiff's damages. But it did not do so; instead, it said that a defendant is immune from civil liability "for the disclosure." Given the absence of compelling textual support for the defendant's argument, I conclude that the Legislature did not intend to foreclose a plaintiff, who has established liability for an illegal discharge, from introducing evidence of an employer's disclosures in order to establish future damages and prove that he or she attempted to mitigate those damages.

Accordingly, because the plaintiff's injury was the discriminatory discharge rather than the defendant's disclosures, and it was the discriminatory discharge for which the defendant was held liable, the future damages award did not constitute "civil liability *for the disclosure*." MCL 380.1230b(3) (emphasis added). Quite simply, the disclosures merely allowed the plaintiff to demonstrate to the jury the full scope of his damages resulting from the defendant's discriminatory discharge decision. I would therefore sustain the jury's award of future damages; I respectfully dissent from the majority's decision to the contrary.

## II. CONCLUSION

I concur with the majority's decision to uphold the jury's verdict finding that the defendant unlawfully discriminated against the plaintiff on the basis of race. But I

7

dissent from the majority's conclusion that MCL 380.1230b(3) barred admission into evidence of the defendant's disclosures of the plaintiff's unprofessional conduct. I would therefore uphold the damages award and affirm the judgment below in its entirety.

Bridget M. McCormack
Richard H. Bernstein

8