# STATE OF MICHIGAN

# COURT OF APPEALS

SHEAN SATGUNAM, M.D.,

Plaintiff-Appellant,

v

HACKNEY GROVER HOOVER & BEAN,

Defendant-Appellee.

UNPUBLISHED
April 18, 2017

No. 330454
Ingham Circuit Court
LC No. 12-001194-NM

SHEAN SATGUNAM,

Plaintiff-Appellant,

v

MICHIGAN STATE UNIVERSITY,

Defendant-Appellee.

No. 330660
Court of Claims
LC No. 12-000140-MK

SHEAN SATGUNAM, M.D.,

Plaintiff-Appellant,

v

HACKNEY GROVER HOOVER & BEAN,

Defendant-Appellee.

No. 331779
Ingham Circuit Court
LC No. 12-001194-NM

Before: KRAUSE, P.J., and K. F. KELLY and GADOLA, JJ.

PER CURIAM.

In Docket No. 330454, plaintiff Shean Satgunam, M.D. (plaintiff) appeals by right an order that granted summary disposition in favor of defendant Hackney Grover Hoover & Bean (law firm) in plaintiff's legal malpractice action stemming from representation plaintiff received

-1-

from Attorney Brett Bean (Bean) in an underlying medical malpractice claim and settlement. In Docket No. 331779, plaintiff appeals by right an order that granted the law firm attorney fees and costs. In Docket No. 330660, plaintiff appeals by right an order that granted defendant Michigan State University (MSU) summary disposition on plaintiff's claim that MSU breached an employment contract by failing to provide an attorney to represent plaintiff who did not have a conflict of interest. Finding no errors warranting reversal, we affirm on all three appeals.

## I. BASIC FACTS

Plaintiff performed bariatric surgery on "Patient A" at Sparrow Hospital on July 15, 2010. Patient A developed complications and died several months later in October 2010. After it received a notice of potential claim from Patient A's estate, MSU hired the law firm to provide legal services in defense of the anticipated claim. Bean began investigating the claim in an effort to defend MSU. After a notice of intent was filed as to both plaintiff and MSU, the law firm, through Bean, agreed to also represent plaintiff. Plaintiff agreed to the representation and met with Bean on April 23, 2012, at which time plaintiff told Bean his impression of the case and its history.

Shortly thereafter, the law firm settled Patient A's medical malpractice claim for $650,000.00. This settlement triggered MSU's duty to report to the National Practitioner Data Bank (data bank) under the Health Care Quality Improvement Act of 1986. This data bank is operated by the Secretary of Health and Human Services and reports are confidential. Reports may only be accessed by permitted entities, including potential employers. Plaintiff argues that the law firm settled Patient A's malpractice claim without his authorization or consent and without counseling plaintiff on the "ancillary consequences" of being reported to the data bank. Plaintiff claims that the report regarding the settlement has made him under-employable or completely unemployable.

Plaintiff brought a legal malpractice claim against the law firm in Ingham Circuit Court and also sued MSU in the Court of Claims, arguing that MSU breached its obligation to defend plaintiff in Patient A's case. Both cases were summarily dismissed. The circuit court concluded that plaintiff failed to demonstrate that he would have been successful in Patient A's case but for the law firm's malpractice. The Court of Claims dismissed plaintiff's case against MSU because it determined that MSU had the authority to settle Patient A's case under MCL 691.1408(1) without plaintiff's express consent.

## II. THE CASE-WITHIN-A-CASE DOCTRINE

In Docket No. 330454, plaintiff argues that the circuit court erred when it concluded that the case-within-a-case doctrine applied to his legal malpractice lawsuit. Plaintiff appeals the circuit court's ruling on his motion in limine, as well as the circuit court's rulings on the two subsequent motions for summary disposition.

This Court will review a circuit court's decision on a motion for limine for an abuse of discretion. *Bellevue Ventures, Inc v Morang-Kelly Investment, Inc,* 302 Mich App 59, 63; 836 NW2d 898 (2013).

"We review de novo motions for summary disposition brought under MCR 2.116(C)(10)." *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). Under that rule, summary disposition is appropriate when "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10).

> A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. The moving party must specifically identify the matters that have no disputed factual issues, and it has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. The party opposing the motion then has the burden of showing by evidentiary materials that a genuine issue of disputed material fact exists. The existence of a disputed fact must be established by substantively admissible evidence, although the evidence need not be in admissible form. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ. [*Bronson Methodist Hosp v Auto-Owners Ins Co*, 295 Mich App 431, 440–441; 814 NW2d 670 (2012) (internal citations omitted).]

"Because a motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint, the circuit court must consider the affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012).

To establish a claim of legal malpractice, a plaintiff must show: "(1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3) that the negligence was a proximate cause of an injury; and (4) the fact and extent of the injury alleged." *Charles Reinhart Co v Winiemko*, 444 Mich 579, 585-586; 513 NW2d 773 (1994), quoting *Coleman v Gurwin*, 443 Mich 59, 63; 503 NW2d 435 (1993). The "last two elements . . . proximate causation and damages, have proven to be problematic." *Basic Food Indus, Inc v. Grant,* 107 Mich App 685, 691; 310 NW2d 26 (1981). To establish proximate causation in some instances, the plaintiff in a legal malpractice suit must show that "but for the attorney's alleged malpractice, [the plaintiff] would have been successful in the underlying suit." *Id.* The purpose of this case-within-a-case requirement is to "insure that the damages claimed to result from the attorney's negligence are more than mere speculation." *Coleman,* 443 Mich at 64. But the concept "has vitality only in a limited number of situations," such as where an attorney's negligence prevents a client from bringing a cause of action . . ., where the attorney's failure to appear causes judgment to be entered against his client[,] or where the attorney's negligence prevents an appeal from being perfected." *Id*.

In *Basic Food Industries,* the defendant represented the plaintiff in a trial concerning legal fees that the client had incurred in a previous action. The plaintiff lost in that action, and was required to pay a judgment of $25,000. In the malpractice case, the jury found for the plaintiff and awarded damages of $5,000. The defendant argued that the malpractice judgment should be reversed because the plaintiff failed to show that it would have prevailed in the prior litigation had the defendant not been negligent, asserting that the plaintiff was required to show that it would have won the suit to establish its legal malpractice claim. *Basic Foods*, 107 Mich

App at 687-690. This Court found that the plaintiff had indeed demonstrated both an attorney-client relationship and negligence on the part of the defendant. The negligence included failing to conduct pretrial discovery, failing to file a counterclaim, failing to keep the client adequately informed of the increased exposure to liability, and failing to seek an adjournment even after learning that a key witness was unavailable. *Id.* at 690-691. But the Court acknowledged the difficulty in proving causation in legal malpractice actions:

> "The factor which has occasioned most difficulty to clients attempting to charge attorneys with liability for negligence in connection with litigation has been the necessity of proving that the damages claimed resulted from the alleged misconduct. The recovery sought is usually the value of the claim in suit in the proceeding in which the negligent act occurred, if the client was a plaintiff in that action, or, if he was a defendant, the amount of the judgment imposed upon him, and, in accordance with general rules as to proximate cause, it is generally held that before such recovery can be had the client must establish that, absent the act or omission complained of, the claim lost would have been recovered or the judgment suffered avoided. Accordingly, the client seeking recovery from his attorney is faced with the difficult task of proving two cases within a single proceeding." [*Id.* at 691, quoting 45 ALR2d 5, s 2, p. 10.]

The Court went on to hold that:

> it would appear that the "suit within a suit" concept has vitality only in a limited number of situations, such as where an attorney's negligence prevents the client from bringing a cause of action (such as where he allows the statute of limitations to run), where the attorney's failure to appear causes judgment to be entered against his client or where the attorney's negligence prevents an appeal from being perfected. In such cases, it is at least arguably true that the suit within a suit requirement serves to insure that the damages complained of due to the attorney's negligence are more than mere speculation. The concept, however, is wholly without value in cases such as the one at bar . . .. Rather, the attorney's liability, as in other negligence cases, is for all damages directly and proximately caused by the attorney's negligence.

> \*\*\*

> We believe that the "suit within a suit" requirement should, as a matter of sound public policy, be limited to the types of cases we have described above. Requiring the plaintiff in all cases to show that he would have prevailed completely in the former action as a condition precedent to recovery in a subsequent malpractice action is a harsh requirement that would preclude otherwise meritorious claims. If the attorney's negligence results in a verdict against his client that is larger than what would have been returned in the absence of his negligence, then the attorney should be held liable for the increased amount of the judgment. [*Basic Food*, 107 Mich App at, 693–694 (footnote and internal citations omitted).]

The Court concluded that the defendant could not act with impunity by simply citing professional judgment. The defendant's many errors that exposed the client to increased liability were not simply mere errors in judgment and the plaintiff properly received a judgment in its favor. *Id.* at 694-695. An attorney's liability is for all damages directly and proximately caused by the attorney's negligence, and might not be just an adverse judgment, but the amount of the judgment. *Id.* at 693-694.

Here, *Basic Food* is distinguishable, and the nature of plaintiff's alleged damages makes the case-within-a-case approach relevant. Plaintiff alleges no direct monetary damage, as the settlement was paid by MSU or its insurer. Plaintiff's "loss" was to his reputation, and allegedly affected his ability to obtain another job. However, to show that damage, plaintiff was required to prove that he would have prevailed in a medical malpractice action, and that he would have obtained the Saginaw job if the information would not have been posted on the data registry. Thus, to prove damages, plaintiff was required that he would have prevailed completely in the underlying action, and there would have been no report to the data bank.

Plaintiff argues that, even if the case-within-a-case doctrine applies, he met that burden by showing that Patient A's claim was defensible. In its November 30, 2015 order granting the law firm summary disposition, the circuit court noted that plaintiff had failed to meet his burden of proving the case-within-a-case under *Basic Foods*:

> Plaintiff's experts testified during their depositions regarding the second requirement of legal malpractice which is the negligence in the representation of the Plaintiff, however, they did not and could not testify that the negligence was the proximate cause of Plaintiff's injury.
>
> Plaintiff claims that because he has medical experts that will testify that the Plaintiff did not violate the standard of care in the underlying medical malpractice claim that he would have prevailed at trial. This court disagrees. The underlying medical malpractice claim involved a young woman who died from complications following elective bariatric surgery. She was married and had two young children. The Defendant had requested expert opinions as to the standard of care regarding Plaintiff's care and treatment of Patient A prior to the decision to settle the matter and had some difficulty finding support for the Plaintiff. Although Plaintiff now has expert witness support, the Estate of Patient A also had experts who would testify that the Plaintiff violated the standard of care causing Patient A's death. Given these sets of facts, it is not surprising that the Plaintiff cannot provide expert testimony to support that he would have completely prevailed in the underlying claim. Even though Patient A's claim was defensible, Plaintiff has failed to show that he would have prevailed completely in the underlying medical malpractice claim.

Plaintiff claimed that the data bank report injured his reputation and that "but for" the settlement of Patient A's case he would not have suffered such a report. The mere fact that Patient A's case may have been *defensible* does nothing to aid plaintiff's burden of showing causation. That is, plaintiff would have had to have prevailed completely in the underlying action for there to have been no report to the data bank.

## III. EXPERT TESTIMONY

In Docket No. 330454, plaintiff argues that the circuit court erred in finding that he needed to present legal expert testimony on the issue of causation where the harm to plaintiff's reputation could be determined from the jury's common knowledge.

Causation involves two inquiries:

> Proof of causation requires both cause in fact and legal, or proximate, cause. Cause in fact requires that the harmful result would not have come about but for the defendant's negligent conduct. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. [*Haliw v Sterling Heights*, 464 Mich 297, 310; 627 NW2d 581 (2001).]

"In professional malpractice actions, an expert is usually required to establish the standard of conduct, breach of the standard, and *causation*." *Dean v Tucker*, 205 Mich App 547, 550; 517 NW2d 835 (1994) (emphasis added). "Where the absence of professional care is so manifest that within the common knowledge and experience of an ordinary layman it can be said that the defendant was careless, a plaintiff can maintain a malpractice action without offering expert testimony." *Law Offices of Lawrence J Stockler, PC v Rose*, 174 Mich App 14, 48; 436 NW2d 70 (1989). But, as previously discussed, for plaintiff to establish proximate causation in this case he had to show that "but for" the law firm's alleged malpractice, he would have been successful in defending Patient A's actions. *Basic Food Indus,* 107 Mich App at 691.

In granting the law firm summary disposition, the circuit court noted that plaintiff was not relieved of his responsibility to present expert testimony on the issue of proximate cause:

> In the instant case, the Court finds that legal expert testimony is required as to the causation element. Plaintiff does have legal expert testimony as to the breach of the standard of care. However this case is complex and includes an underlying medical malpractice claim, the relationship between the Plaintiff and MSU, the effect of the indemnification agreement as well as the "case within a case" requirement. This is not the situation where the causal connection between Defendant's negligence and Plaintiff's damages would be obvious to an ordinary layman. Expert testimony would be necessary to establish that causal connection.

Plaintiff contends that this was error because the settlement of Patient A's claim, the report to the data bank, and the subsequent harm to his reputation could be determined from common knowledge. Plaintiff erroneously argues that presenting expert testimony as to the law firm's breach of the standard of care sufficed to prove the remainder of his claim – that the law firm caused plaintiff "the lifetime of lost wages and career when the report was filed with the National Practitioner Data Bank." Plaintiff cannot make such a leap because a successful defense of Patient A's claim was not within the purview of the jury without expert opinion. In fact, plaintiff's own experts acknowledged that predicting the outcome of the case was impossible.

-6-

Malpractice Attorney Richard J. Dimanin believed the law firm was confronted with a conflict of interest when it undertook representing both MSU and plaintiff. He also believed that the law firm breached the standard of care when it failed to apprise plaintiff that a settlement would result in his being reported to the data bank. Such an ancillary consequence was critical to plaintiff's ability to make an informed decision about whether to settle and failing to get plaintiff's written consent with an indication that plaintiff was aware of the ancillary consequences of the settlement was a breach of the standard of care. However, Dimanin confirmed that he was *not* offering an opinion as to causation. The following exchange took place:

> *Q.* . . . So, MSU settles out. Satgunam has his own attorney. And then what? MSU still reports Satgunam to the National Practitioners Data Bank?
>
> *A.* Correct.
>
> *Q.* So then the result is the same?
>
> *A.* Well, like I said, my – that isn't my role here. My role is simply to tell about the conflict. I don't know what internal remedies are available in terms of presenting to Michigan State's board or presenting the case to the board. I don't know how that goes. But I would assume that there's some type of administrative hearing or administrative process where Dr. Satgunam's objections to the settlement would be heard.
>
> *Q.* Are you here to offer expert testimony on proximate cause or breach only?
>
> *A.* Just what I've talked about today.
>
> *Q.* Well, can you answer my question[?] I need to know.
>
> *A.* Proximate cause, no. It's just – just what I testified to regarding the consent issue and the breach.

In fact, given the facts of this case, Dimanin was impressed that the firm was able to negotiate such a low settlement with Patient A's estate. He also acknowledged that just because a case was defensible did not remove the risk of going to trial – "I've won cases I should have lost, and I've lost cases I should have won." Dimanin could not say with a reasonable degree of certainty that plaintiff would have received a "no cause" judgment if the case had gone to trial.

Former Bay County Circuit Court Judge William J. Caprathe also testified that the law firm breached its standard of care in failing to reveal the conflict of interest, failing to apprise plaintiff of the "collateral consequences" of accepting a settlement, and failing to obtain plaintiff's consent to settle. In terms of the underlying medical malpractice lawsuit, Caprathe acknowledged that "you never know what a jury is going to do," especially in this type of case with a young, sympathetic working mother who died as a result of elective surgery. He added: "I'm not here to assess the percentage of liability on the underlying case or not. I just see that from what I've read, it looks like there was some – a defense." Therefore, like Dimanin,

Caprathe did not offer causation testimony and acknowledged that he was *not* offering an opinion as to what the result would have been had Patient A's case gone to trial. In fact, he had no experience with the data bank. Caprathe could not say whether the result would have changed at all:

> *Q*. It sounds to me, in a nutshell, that – and I understand your criticisms, I think we've gone over them, it sounds to me that you're offering opinions as to the standard of care and breaches of the standard of care, is that correct?

> *A*. Correct.

> *Q*. But you're not here necessarily to offer expert testimony on the issue of proximate cause, because you're not exactly sure if things had been done as you indicate they should have been, whether it necessarily would have changed the ultimate outcome, is that fair?

> *A*. That's correct.

The need for expert opinion on the issue of causation is especially obvious in this case where plaintiff contends that he lost at least one employment opportunity because the settlement with Patient A's estate was reported to the data bank. However, there were actually *two* reports to the data bank – (1) the report regarding the settlement in Patient A's case; and (2) a second report detailing that plaintiff's privileges at Sparrow Hospital had been suspended. See *Satgunam v Michigan State Univ*, 556 Fed Appx 456, 458–459 (CA 6 2014); *Satgunam v Basson*, No. 1:12-CV-220, 2013 WL 12093005 (WD Mich February 6, 2013). In order to succeed in his medical malpractice claim, plaintiff had to establish that the report to the data bank regarding Patient A's case resulted in additional harm to his reputation. Plaintiff was not relieved of his obligation to prove causation through expert testimony.

### IV. MSU'S AUTHORITY TO SETTLE UNDER MCL 691.1408

In both Docket No. 330454 and Docket No. 330660, plaintiff argues that the circuit court erred in finding that either MSU or the law firm had the authority to settle Patient A's medical malpractice action under MCL 691.1408 without plaintiff's authority, especially where it appears that plaintiff was unaware of the full consequences of the settlement. He maintained that while the statute permits MSU to spend public funds to settle a claim on behalf of an employee it does not "quash a public employee's autonomy to decide whether or not to settle claims alleged and also does not transfer case decision-making authority" to MSU. Plaintiff further argues that under the plain language of the indemnification agreement, even if MSU had the statutory authority to settle on plaintiff's behalf, it gave up that right.

"Statutory interpretation is a question of law that we review de novo." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604-605; 886 NW2d 135 (2016). Likewise, contract interpretation presents a question of law, which requires de novo review. *White v Taylor Distrib Co, Inc*, 289 Mich App 731, 734; 798 NW2d 354 (2010).

Section 1408(1) is nestled in the governmental tort liability act (GTLA), MCL 691.1401 *et seq*., which has the following as its purpose:

AN ACT to make uniform the liability of municipal corporations, political subdivisions, and the state, its agencies and departments, officers, employees, and volunteers thereof, and members of certain boards, councils, and task forces when engaged in the exercise or discharge of a governmental function, for injuries to property and persons; to define and limit this liability; to define and limit the liability of the state when engaged in a proprietary function; to authorize the purchase of liability insurance to protect against loss arising out of this liability; to provide for defending certain claims made against public officers, employees, and volunteers and for paying damages sought or awarded against them; to provide for the legal defense of public officers, employees, and volunteers; to provide for reimbursement of public officers and employees for certain legal expenses; and to repeal acts and parts of acts. [MCL Ch. 691, Refs & Annos (West).]

The purpose of governmental immunity is to avoid the expenditure of state funds in litigation. *Costa v Community Emergency Med Serv, Inc*, 475 Mich 403, 410; 716 NW2d 236 (2006). Broadly, MCL 691.1407(2) provides that a governmental employee is immune from tort liability if he is able to demonstrate that he acted within the scope of his authority and was not grossly negligent. MCL 691.1407(2). However, MCL 691.1407(4) provides that the statute "does not grant immunity to a governmental agency or an employee or agent of a governmental agency with respect to providing medical care or treatment to a patient . . ." See also *Briggs v Oakland Co*, 276 Mich App 369, 371; 742 NW2d 136 (2007).

The GTLA provides that a governmental agency may assist an employee who faces liability for actions that occurred in the course of employment. MCL 691.1408(1) provides:

Whenever a claim is made or a civil action is commenced against an officer, employee, or volunteer of a governmental agency for injuries to persons or property caused by negligence of the officer, employee, or volunteer while in the course of employment with or actions on behalf of the governmental agency and while acting within the scope of his or her authority, the governmental agency may pay for, engage, or furnish the services of an attorney to advise the officer, employee, or volunteer as to the claim and to appear for and represent the officer, employee, or volunteer in the action. The governmental agency may compromise, settle, and pay the claim before or after the commencement of a civil action. Whenever a judgment for damages is awarded against an officer, employee, or volunteer of a governmental agency as a result of a civil action for personal injuries or property damage caused by the officer, employee, or volunteer while in the course of employment and while acting within the scope of his or her authority, the governmental agency may indemnify the officer, employee, or volunteer or pay, settle, or compromise the judgment.

"[T]he governmental immunity act contemplates that government employees may be held liable for performing their jobs in a grossly negligent manner. Indeed, the Legislature has expressly authorized government agencies to defend and indemnify employees facing potential tort liability for injuries caused by the employee 'while in the course of employment and while acting within the scope of his or her authority . . .'" *Beaudrie v Henderson*, 465 Mich 124, 140; 631 NW2d 308 (2001). The statute does not *require* a governmental agency to provide an employee

with legal counsel, but clearly permits the agency to do so when one of its employees faces suit for actions that occurred while in the course of employment. *Warda v City Council of City of Flushing*, 472 Mich 326, 332; 696 NW2d 671 (2005) ("The use of the word 'may' in § 8 makes clear that the decision to pay an officer's attorney fees is a matter left to the discretion of the [governmental agency].")

The state has offered additional protection for universities like MSU, who undertake to provide insurance and attorneys to their employees for incidents arising out of their employment. MCL 390.1126 provides:

> The state shall assume the excess loss of the university or its agents if the university adopts an indemnification and hold harmless policy in which the university agrees to indemnify, save harmless, and defend its agents against professional liability and premises liability arising out of, related to, or incurred in the course of, employment, assigned duties, course of academic studies, or authority and establishes an indemnification reserve fund consistent with this act.

"Loss" includes: "Health care professional liability which the university becomes legally obligated to pay or for which the university assumes the obligation to pay as damages or costs because of injury to a person arising out of the rendering of, or failure to render, health care services . . ." MCL 390.1124(3)(a). To that end, MSU's policy regarding indemnifying its employees provides:

> Michigan State University will support its trustees, officers, faculty, and staff when acting in the performance of assigned duties on behalf of the University. This policy also applies to students while engaged in approved academic programs and volunteers who are performing services for the University with prior written approval of the appropriate University official. The University will defend, save harmless, and indemnify such persons against any suit or proceeding, whatever brought, premised upon the fact that he or she is or was a member of the Board or an officer, employee, student, or volunteer of the University. The indemnity extends to expenses including attorney fees, judgments, fines, and amounts paid in settlement, actually and reasonably incurred, and with respect to any criminal action or proceeding where such person had no reasonable cause to believe that his or her conduct was unlawful. As a condition of indemnification, the true, official, employee, student, or volunteer is required to cooperate fully on a continuous basis with the University Attorney and the office of Insurance and Risk Management.

It is clear from the plain language of MCL 691.1408(1), as well as the underlying policy considerations, that MSU retained the right to settle Patient A's case as a means of limiting its liability exposure under the GTLA. Contrary to plaintiff's arguments, MSU did not lack the legal authority to settle Patient A's claim without his consent.

Plaintiff argues, however, that under the parties' indemnification agreement, MSU modified its rights because the agreement provides that any attorney assigned to represent plaintiff would do so as though plaintiff were paying for the service and that the attorney would

have an independent ethical duty to represent plaintiff. Plaintiff claims that he maintained control of the case. The indemnification agreement between plaintiff and MSU provided:

**REQUEST FOR REPRESENTATION AND INDEMNIFICATION**

I, Shean Satgunam, M.D., ask that Michigan State University provide for my defense regarding the Notice of Intent filed by the Estate of ▇▇▇▇▇▇▇. I ask that MSU bear the cost of any judgment that may be entered against me and/or of any settlement of claims asserted against me. I understand that I am free to retain my own counsel. If I were to do so, I would be responsible for the cost of my defense, as well as for any resulting judgment or settlement.

In making this request, I understand that I must aid in the defense, and I accept that:

1. Being provided representation and indemnification is contingent upon my continuing cooperation in the defense, including my being forthcoming in communications with my counsel, and accessible to counsel;

2. I will abide by defense counsel's lawful instructions and will make myself available to attend depositions, court proceedings and defense conferences.

In making this request, I warrant that either: (check one)

_____ I am not aware of any personal interest related to the subject matter of this case which may pose a conflict with MSU's interests.

__✓__ I am aware of a possible conflict of interest, and I understand that I must disclose all information regarding the matter to defense counsel, at the first opportunity. I understand that I am obliged to disclose information regarding any conflict or conflict of interest between me and any other defendant(s).

I understand that defense counsel provided in this matter will have an independent ethical duty to represent me, and that the attorney will serve me just as though I were paying directly for his or her services. Defense counsel will confer with me regarding defense strategy and other decisions. I make this request of my own accord. It is not subject to any other agreements or understandings.

Dated: Feb. 28, 2012

Shean Satgunam, M.D.

HG000000126

The parties' agreement did nothing to change MSU's ability to settle the claim under MCL 691.1408(1). The plain language of the agreement does not preclude MSU from settling Patient A's claims and does not specifically vest in plaintiff the right to control the case. In fact, the very language requiring plaintiff to specifically "aid in the defense," continue to cooperate, and "abide by the defense counsel's lawful instructions," indicates that plaintiff lacked the authority to control the trajectory of Patient A's claim.

Plaintiff's own expert conceded as much. Dimanin acknowledged that there were indications that plaintiff was on notice that there was a facilitation process. He also testified:

> *Q.* So, again, playing out this hypothetical, Satgunam hires his own attorney. He's objecting to the settlement. Michigan State is still free to settle this case with David Mittleman [attorney for Patient A's estate], right?
>
> *A.* Mm-hmm. Yes.

-11-

*Q.* I mean, Dr. Satgunam doesn't have the authority to put the brakes on any settlement of the case, right?

*A.* Correct.

*Q.* So MSU --

*A.* As far as I could see.

*Q.* So MSU settles out. I mean, it would be nonsensical for MSU to cede the authority to settle the case to one of its employees, right?

*A.* Right.

\*\*\*

*Q.* Right. Okay. We agree on that.

So, MSU settles out. Satgunam has his own attorney. And then what? MSU still reports Satgunam to the National Practitioners Data Bank?

*A.* Correct.

Additionally, plaintiff was well aware that settlement negotiations were taking place and he did nothing to object. For example, plaintiff was copied on an April 11, 2012 letter from Bean to MSU's general counsel regarding the "facilitation effort on this case." The letter indicated that MSU offered $350,000 but that Patient A's estate demanded $875,000. The letter stated that "[d]ue to time limitations, as well as the fact that both parties seemed to see this case quite differently, the facilitation effort was adjourned. *Everybody agreed that the door would be left open for further discussion.*" (Emphasis added.) Second, Bean's notes following his April 23, 2012, meeting with plaintiff indicate: "My conversation with Dr. Satgunam filled in some of the blanks from the medical records. I advised Dr. Satgunam that *if this case did not get resolved through the facilitation process*, I would confirm the support of Kurt Kralovich, M.D. and revisit with our earlier experts to see if they can become more supportive." (Emphasis added.) Finally, plaintiff's attorney in the district court action, Jeffrey L. Herron, emailed Bean and Michael Kiley (MSU's general counsel) about a potential conflict of interest on April 23, 2012, just before Bean met with plaintiff: "I just wanted to make it clear to you that your clients are in conflict with each other on a matter that has some nexus with the events underlying the malpractice claim. *Neither I nor my client have any interest in gumming up the malpractice claim or its resolution*, but don't believe that means we should ignore a potential conflict." (Emphasis added.) Plaintiff could have raised his objections or, if he was truly concerned about a conflict of interest, plaintiff was free to obtain his own attorney.

Finally, a report to the data bank regarding Patient A's claim was inevitable. 45 CFR 60.7(a) provides:

Each entity, including an insurance company, which makes a payment under an insurance policy, self-insurance, or otherwise, for the benefit of a health care

practitioner in settlement of or in satisfaction in whole or in part of a claim or a judgment against such health care practitioner for medical malpractice, must report information as set forth in paragraph (b) of this section to the NPDB and to the appropriate state licensing board(s) in the state in which the act or omission upon which the medical malpractice claim was based.

The law firm agrees that a payment as a result of a claim that is solely against an entity and that does not specifically identify an individual practitioner does not need to be reported, but that is not what happened in this case. Patient A's notice of intent specifically identified plaintiff and the settlement was paid on his behalf. MSU's general counsel, Kiley, averred that MSU would have reported the settlement to the data bank regardless of whether plaintiff had his own attorney because it was legally obligated to do so. As such, the report to the data bank was inevitable.

## V. CASE EVALUATION SANCTIONS

In Docket No. 331779, plaintiff argues that the circuit court erred in considering the law firm's late request for sanctions and then failed to properly exercise its discretion in awarding such sanctions. Plaintiff further argues that the circuit court erred in using the market rate for attorney fees rather than the hourly fee actually billed, thereby providing the law firm's attorneys a windfall.

> A trial court's decision whether to grant case-evaluation sanctions under MCR 2.403(O) presents a question of law, which this Court reviews de novo. We review for an abuse of discretion a trial court's award of attorney fees and costs. An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes. [*Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008).]

### A. TIMELINESS OF THE REQUEST

While the law firm accepted the $15,000 case evaluation in plaintiff's favor, plaintiff failed to respond entirely, which resulted in a rejection. Following the trial court's order granting summary disposition in its favor, the law firm sought case evaluation sanctions pursuant to MCR 2.403. Plaintiff responded that the request was untimely because it was made more than 28 days after dismissal of the case. Defense counsel pointed out that a courier was sent to file the motion for case evaluations sanctions on December 28th, but the trial court was closed due to inclement weather. The trial court understood:

> I did authorize closing the courts at noon that day based upon not just the fact that the county was closing all of its offices and buildings which happens to be where our Court is maintained but because of the impending poor weather that was coming in and concern for people traveling on the streets of the area that day. The Probate Court also was closed. The district Court for Ingham County was also closed. You probably will not find an Order regarding that. That was something that was a decision that I made in discussions and email went out to that effect and, ah, to all staff here at the Court telling them that we were closing and to show up Tuesday morning.

-13-

***

I have to say that at 1:30 on, ah, December 28 it was impossible to file this and it was impossible based upon the actions of the Court in closing based upon the weather. Because of that and this is not the first time that this has come up. This is not the only thing that needed to be filed by 5 o'clock on December 28th. We have many, many different types of deadlines that needed to be met that day. Anybody that needed to file anything on the 28th was given the opportunity to file that timely on the 29th. Had you filed it, Mr. Gilchrist [defense counsel] on the 30, I would have said, no. Had you not come in and said that you attempted to file it at a time when the Court was closed, I would have also said no. So based upon the information that, you know, I can tell you again as Chief Judge that I did authorize closure of the Court at noon on December 28 based upon the weather predictions, poor weather in the area as well as in conjunction with the other courts of our county and in working with our county controller who was closing county offices.

So based upon that I am going to allow the filing on the 29. I think that's the right thing to do even though I understand what the technical reading of this computation of time would be. That would be people that miss statutes of limitations, that made the effort that came here to file and came here and the Court was closed. As indicated we had other deadlines of filings in many other types of issues that were also at issue that day.

The trial court did not abuse its discretion when it permitted the law firm to file the request one day after it attempted to do so. Plaintiff asks the law firm to be penalized for failing to do the impossible.

## B. INTERESTS OF JUSTICE EXCEPTION

Plaintiff argued that the circuit court should have exercised its discretion in refusing to award case evaluation sanctions because the case was one of "first impression" over whether the case-within-a-case doctrine applied.

If the verdict is the result of a judgment entered as the result of a motion after rejection of the case evaluation, the court may, in the interests of justice, refuse to award actual costs. MCR 2.403(O)(11). But the trial court may not expand the exception too broadly and the "interests of justice" is fairly limited, including when there is a legal issue of first impression presented or when the law is unsettled. *Harbour v Correctional Med Serv, Inc*, 266 Mich App 452, 466; 702 NW2d 671 (2005), lv den 475 Mich 859 (2006); *Haliw v Sterling Hts*, 257 Mich App 689, 707; 669 NW2d 563 (2003), rev'd on other grounds 471 Mich 700 (2005).

Regarding whether the case warranted case evaluation sanctions, the trial court noted:

As to the discretion in awarding sanctions. Um, the Court is aware that it is discretionary because this was done through a motion and the Court certainly does understand the concerns of Dr. Satgunam regarding his position, regarding the case within a case doctrine. And the Court has been well aware for ever since

-14-

I've made the ruling that that was something that the Plaintiff absolutely disagreed with and believes that the Court made a legal error in reaching that decision. However, I do have to say, ah, regarding this case evaluation, specifically, and whether or not sanctions would be appropriate, you know, I have looked at the fact that what was requested was $9 million and the case evaluated for [$]15,000. What this tells the Court and I think maybe a message that was probably short of being sent to the Plaintiff is that they considered, the panel anyway, considered this a case that was not likely to, ah, bring much, if anything, . . .if there was a trial, that the claim just didn't have a lot of merit. And quite frankly that type of amount I believe was put there to send a message, I think, to maybe the Plaintiff that resolving it would be appropriate. It's very interesting to the Court to get a request for 9 million and get an evaluation for [$]15,000. For lack of a better term it appears to me that the panel believed this to be more of a nuisance suit and put the amount smaller so it would be cheaper as we see for the Defendant to pay that damage than to prosecute or litigate the case so the Defendant did accept. The Plaintiff did not. And, again, that necessitated moving forward based upon what the Plaintiff was aware of, what the panel thought that the value of the litigation was. And I would have to say probably more than anything that that is what I think makes the difference in this Court's mind in sending – in determining that I do believe that sanctions are appropriate in this matter and I am going to award those.

The trial court did not abuse its discretion when it determined that case evaluation sanctions were warranted. Our Supreme Court has explained:

The purpose of this fee-shifting provision is to encourage the parties to seriously consider the evaluation and provide financial penalties to the party that, as it develops, "should" have accepted but did not. This encouragement of settlements is traditional in our jurisprudence, as it deters protracted litigation with all its costs and also shifts the financial burden of trial onto the party who imprudently rejected the case evaluation. [*Smith*, 481 Mich at 527–528.]

Clearly the trial court's observations are in accordance with this principle. Additionally, although whether the application of the case-within-a-case doctrine was in dispute, there was nothing novel about the arguments made in the trial court.

## C. AMOUNT AWARDED

Finally, plaintiff argues that the circuit court erred when it awarded sanctions based on a reasonable hourly rate rather than the *actual* hourly rate the law firm charged the insurance company.

*Smith* detailed what trial courts have been doing when calculating attorney fees, such as using the factors found in *Wood v Detroit Automobile Inter-Ins Exch*, 413 Mich 573, 588; 321 NW2d 653 (1982), that were derived from *Crawley v Schick*, 48 Mich App 728, 737; 211 NW2d 217 (1973). The factors are: (1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the

difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client. *Smith*, 481 Mich at 529. The *Smith* Court also recognized that many trial courts had been consulting the eight factors found in Rule 1.5(a) of the Michigan Rules of Professional Conduct, which are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. *Id.* at 529-530. The Supreme Court further noted that trial courts have not limited themselves to only consulting the factors listed above. *Id.* at 530.

Recognizing that "some fine-tuning" was required, the *Smith* Court instructed that when determining an attorney fee pursuant to MCR 2.403, trial courts should first determine the "reasonable hourly rate [which] represents the fee customarily charged in the locality for similar legal services," and the trial court should rely on "reliable surveys or other credible evidence of the legal market." *Id.* at 530-531. The Court emphasized that the burden is on the fee applicant to produce satisfactory evidence "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Id.* at 531, quoting *Blum v Stenson*, 465 US 886, 895 n 11; 104 S Ct 1541; 79 L Ed 2d 891(1984). The Court then instructed that trial courts should multiply that number by the "reasonable number of hours expended in the case." *Smith*, 481 Mich at 531. The Court again emphasized that "[t]he fee applicant bears the burden of supporting its claimed hours with evidentiary support." *Id.* at 532. After this initial baseline figure has been calculated, "[i]n order to aid appellate review, a trial court should briefly discuss its view of the remaining [*Wood* and MRPC] factors" and whether such factors justify an upward or downward adjustment. *Id.* at 531.

Plaintiff complains that the trial court should have awarded the fees charged because performing a traditional analysis regarding what fees were in the locality resulted in a windfall. The *Smith* Court warned that the court rule "is not designed to provide a form of economic relief to improve the financial lot of attorneys or to produce windfalls." *Smith*, 481 Mich at 528. However, the *Smith* Court also noted, "[r]easonable fees are not equivalent to actual fees charged." *Id.* at 528 n 12, quoting *Zdrojewski*, 254 Mich App 50, 72; 657 NW2d 721 (2002). Instead, the court rule "only permits an award of a *reasonable* fee, i.e., a fee similar to that customarily charged in the locality for similar legal services, which, of course, may differ from the actual fee charged." *Smith*, 481 Mich at 528. The trial court did not abuse its discretion when it followed the exact framework set forth in *Smith*. The fee actually charged is only one consideration in the overall determination of what fee is reasonable for purposes of case evaluation sanctions.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Kirsten Frank Kelly
/s/ Michael F. Gadola

-16-