*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HAZEM ELTAHAWY,

        Plaintiff-Appellant,

v

TRINITY HEALTH-MICHIGAN, doing business as
ST. MARY MERCY LIVONIA HOSPITAL, and
IHA HEALTH SERVICES CORPORATION,

        Defendants-Appellees.

UNPUBLISHED
March 25, 2025
2:12 PM

No. 369502
Wayne Circuit Court
LC No. 22-013625-CD

Before: MALDONADO, P.J., and LETICA and WALLACE, JJ.

PER CURIAM.

In this employment discrimination case, plaintiff appeals as of right from the order granting summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact) in favor of defendants.[1] We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

This case arises from plaintiff's former employment with defendants. St. Mary Mercy Livonia Hospital (St. Mary's) is a hospital owned and operated by defendant Trinity Health-Michigan (Trinity). Defendant IHA Health Services Corporation (IHA) is a nonprofit health care corporation, and a subsidiary of Trinity that manages Trinity's physician groups, including physicians employed at St. Mary's.

---

[1] When necessary, we will refer to Trinity Health-Michigan, d/b/a St. Mary Mercy Livonia Hospital as "Trinity" and IHA Health Services Corporation as "IHA." Both parties collectively will be referenced as "defendants."

Plaintiff, at the time of filing his complaint, was 51 years old.[2] He identifies as a white male of Egyptian national origin. He is also a physician specializing in complex brain and spine neurosurgery. Plaintiff entered into a three-year employment agreement with defendants commencing in February 2017, wherein he agreed to serve as the Chief of Neurosurgery and perform clinical neurosurgery services. When plaintiff's first term as Chief of Neurosurgery ended, he entered into a second employment agreement with defendants (the Agreement). The Agreement addressed, in relevant part, plaintiff's duties as a physician, compensation, and termination. Additionally, as part of his employment, plaintiff had to abide by other policies effectuated by defendants, including IHA's Medical Record Documentation Policy, IHA's Provider Delinquency Action Plan, and St. Mary's Emergent Surgical Cases Policy.

In February 2020, St. Mary's hired Dr. Sussan Salas, M.D., to provide clinical neurosurgery services alongside plaintiff for a three-year term. Dr. Salas is a female physician of Hispanic ethnicity, who was 44 years old at the time plaintiff filed his complaint. In November 2020, during a meeting with the Chief Medical Officers for IHA and St. Mary's, plaintiff was given a 90-day written notice terminating his employment, effective February 2021. The notice states that plaintiff would be paid at his "current established bi-weekly rate (less applicable taxes and withholding)" throughout the 90-day period, but that plaintiff would "not perform any work activity on behalf of IHA and [St. Mary's,]" effective November 2020. Because plaintiff was prohibited from working, defendants did not pay plaintiff for any on-call neurosurgery coverage during the 90-day notice period. Instead, Dr. Salas assumed plaintiff's medical practices, duties, and responsibilities immediately following his termination.

In November 2022, plaintiff filed suit against defendants, alleging defendants violated the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, by discriminating against him on the basis of his sex, age, and national origin because they terminated his employment "so that [Dr. Salas], who is younger, female, and non-Egyptian and a less experienced neurosurgeon, could assume his duties and responsibilities and the lucrative Neurosurgery and associated clinical services practice he had developed at St. Mary['s]." Plaintiff claimed that any reasons defendants had for terminating his employment were "false and pretexts" to cover up their "discriminatory refusal" to treat plaintiff the same as Dr. Salas and other similarly situated physicians who did not share his protected characteristics. Plaintiff also alleged that defendants breached the terms of the Agreement by failing to pay him the "Ninety Thousand Dollars ($90,000.00) to which he was entitled under the Agreement for 20 call days per month he otherwise would have been expected to provide" during the 90-day termination notice period because defendants prohibited him from working.

In October 2023, defendants moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff's breach of contract claim failed as a matter of law because under the plain, unambiguous language of the Agreement, he was not entitled to on-call pay during the 90-day notice period because did he did not actually perform any on-call work. Additionally, defendants

---

[2] Plaintiff was not board certified by the American Board of Medical Specialties. When he was recruited by St. Mary's, he was given a waiver of the certification requirement because his international training was accepted as evidence of his boards.

argued that they were entitled to summary disposition for his discrimination claims because plaintiff could not establish that he was discriminated against on the basis of his age, sex, or national origin. Specifically, defendants claimed that: (1) plaintiff could not identify a similarly situated individual outside of his protected class that was treated more favorably than he was; (2) plaintiff was terminated for legitimate, nondiscriminatory reasons, such as failing to timely respond to calls, complete medical documentation, and integrate Dr. Salas into the neurosurgery practice; and (3) plaintiff could not show that these reasons were pretext for discrimination.

Plaintiff responded, claiming that summary disposition would be improper because the Agreement did not give defendants discretion to preclude him from providing on-call neurosurgical services during the 90-day notice period. Alternatively, plaintiff alleged that the terms of the Agreement still obligated defendants to compensate him for all on-call payments he would have received during the notice period. Regarding his discrimination claims, plaintiff asserted that there was a genuine issue of material fact whether defendants discriminated against him on the basis of his age, sex, and national origin because he had both direct and circumstantial evidence of defendants' discrimination. Plaintiff also argued that the same actor inference was inapplicable, that he sufficiently established that defendants treated him differently than "all similarly situated younger, non-Egyptian, and female physicians," and that defendants' rationale for his termination was merely pretext for discrimination.

In reply, defendants asserted that because the Agreement clearly provided that plaintiff was only entitled to payment for days that he was actually on call, and plaintiff did not complete any on-call shifts during the 90-day notice period, plaintiff's breach of contract claim failed. Defendants also contended that plaintiff misconstrued evidence to claim he had proof that defendants wanted to hire Dr. Salas because she was a young, female neurosurgeon. Rather, the evidence, when read in context, did not imply discrimination or express a preference for Dr. Salas over plaintiff. Defendants further argued that none of plaintiff's other evidence constituted direct evidence of discrimination, plaintiff could not identify any circumstantial evidence demonstrating that his termination had any discriminatory basis, plaintiff failed to identify any similarly situated employees outside of his protected class that were treated more favorably than him, and plaintiff failed to show defendants' rationale for termination was pretextual.

After holding a hearing on defendants' motion, the trial court entered an opinion and order granting summary disposition to defendants regarding plaintiff's discrimination and breach of contract claims. The trial court found that plaintiff failed to submit direct evidence of discrimination because he did not allege "that any comments, derogatory remarks, or slurs were made regarding his Egyptian origin, his age, or his sex," and the circumstantial evidence he relied upon did not demonstrate "a preference for [Dr. Salas] over Plaintiff based on age or sex." The trial court also found that plaintiff failed to show similarly situated employees outside of plaintiff's protected classes were treated more favorably than him for similar conduct. Accordingly, the trial court dismissed plaintiff's discrimination claims. Regarding plaintiff's breach of contract claim, because there was "no provision in the Agreement that prevent[ed] Defendants from completely terminating Plaintiff[']s provision of services," or entitling plaintiff "to payment for a minimum number of hours of on-call services," the trial court found that plaintiff's breach of contract claim failed as a matter of law. This appeal followed.

## II. STANDARDS OF REVIEW

We review the grant or denial of summary disposition de novo. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 229; 964 NW2d 809 (2020). That is, the appellate court reviews the issue independently, deference to the trial court is not required. *Millar v Constr Code Auth*, 501 Mich 233, 237; 912 NW2d 521 (2018). When deciding a motion under MCR 2.116(C)(10), the trial court "must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). If the moving party properly asserts and supports its motion for summary disposition, the "burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). The trial court must only grant summary disposition under MCR 2.116(C)(10) "when there is no genuine issue of material fact," meaning that the record does not leave "open an issue upon which reasonable minds might differ." *El-Khalil*, 504 Mich at 160 (quotation marks and citations omitted). To the extent that resolution of this appeal requires interpretation of the parties' employment contract, questions of contract interpretation present questions of law and are also reviewed de novo. *White v Taylor Distrib Co, Inc*, 289 Mich App 731, 734; 798 NW2d 354 (2010).

## III. EMPLOYMENT DISCRIMINATION

Plaintiff claims the trial court erred by granting summary disposition to defendants because there was a genuine issue of material fact whether, in violation of ELCRA, defendants discriminated against him on the basis of his age, nation of origin, ethnicity, and sex.

Section 202 of ELCRA provides, in relevant part:

> (1) An employer shall not do any of the following:
>
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, *national origin*, *age*, *sex*, sexual orientation, gender identity or expression, height, weight, or marital status. [MCL 37.2202 (emphasis added).]

"The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 606; 886 NW2d 135 (2016). Employment discrimination in violation of ELCRA can be established by direct or circumstantial evidence. *Major v Village of Newberry*, 316 Mich App 527, 540; 892 NW2d 402 (2016).

### A. DIRECT EVIDENCE

"In cases involving direct evidence of discrimination, a plaintiff may prove unlawful discrimination in the same manner as a plaintiff would prove any other civil case." *Id*. (quotation marks and citation omitted). Direct evidence "is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id*. (quotation marks and citation omitted). "Under the direct evidence test, a plaintiff must present

-4-

direct proof that the discriminatory animus was causally related to the adverse employment decision." *Sniecinski v Blue Cross & Blue Shield*, 469 Mich 124, 135; 666 NW2d 186 (2003). Direct evidence can include statements directly linking an employee's protected characteristics to their ability to perform their job or statements made during an adverse action wherein the employer makes a reference to the employee's protected characteristics. See *DeBrow v Century 21 Great Lakes, Inc*, 463 Mich 534, 538-539; 620 NW2d 836 (2001); *Major*, 316 Mich App at 542-545.

Plaintiff argues that defendants' e-mails constitute direct evidence of their discrimination on the basis of his age, sex, and nation of origin because they indicate that defendants hired Dr. Salas because she was a young, female, Hispanic neurosurgeon and would have a lesser salary than plaintiff. In plaintiff's view, these e-mails coupled with his termination shortly after Dr. Salas received her medical board certification, and Dr. Salas's assumptions of plaintiff's responsibilities after his termination, are direct proof of defendants' discrimination. But plaintiff fails to acknowledge that the e-mails in no way mention *plaintiff's* protected characteristics or indicate a preference for Dr. Salas's protected characteristics. Plaintiff cannot show that the e-mails demonstrated defendants' discriminatory animus toward him or that there was direct causal relationship to his termination in light of their timing. The e-mails were sent nearly an entire year before plaintiff's termination and the representative who sent these e-mails did not participate in plaintiff's termination.

When reviewed in context, plaintiff misconstrues the e-mails. Defendants' representative discussed Dr. Salas's status as a "young, female, personable neurosurgeon" because she was concerned it was a "red flag" that Dr. Salas's prior employer did not retain her despite those characteristics. Defendants' representative did not reference Dr. Salas's nation of origin. And the representative's comment regarding plaintiff's salary was made in reference to the fact that Dr. Salas would not be paid the same as plaintiff because she was less experienced than he was, which has nothing to do with plaintiff's or Dr. Salas's protected characteristics.[3] Additionally, plaintiff admitted that no one told him Dr. Salas was hired to replace him or made any discriminatory or derogatory comments toward him. Thus, when viewed in context, it is clear that plaintiff failed to produce any direct evidence of discrimination and the trial court did not err in making this determination.

## B. CIRCUMSTANTIAL EVIDENCE

Where no direct evidence is available, the plaintiff may offer circumstantial evidence "from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001) (quotation marks and citation omitted). The plaintiff is not required to produce enough evidence to allow the case to go to a jury; rather, he need only produce enough evidence to create a rebuttable presumption of discrimination. *Meagher v Wayne State Univ*, 222 Mich App 700, 710-711; 565 NW2d 401 (1997). Circumstantial evidence offered in support of claims of discrimination is analyzed under

---

[3] Specifically, the representative stated, "Since [Dr. Salas] is only 2 years out, she hopefully would not require the type of salary that [plaintiff] enjoys."

the *McDonnell Douglas*[4] burden-shifting framework. See *Hazle*, 464 Mich at 462-463. The *McDonnell Douglas* framework "provides a mechanism for assessing motions for summary disposition and directed verdict in cases involving circumstantial evidence of discrimination," and "is merely intended to progressively sharpen the inquiry into the elusive factual question of intentional discrimination." *Id*. at 466. "It is useful only for purposes of assisting trial courts in determining whether there is a jury-submissible issue on the ultimate fact question of unlawful discrimination." *Id*.

Under this framework, a plaintiff must first set forth a prima facie case of discrimination by presenting evidence that he or she (1) belongs to a protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination. *Id*. at 463. Regarding the fourth prong, a plaintiff "can attempt to prove discrimination by showing that the plaintiff was treated unequally to a similarly situated employee who did not have the protected characteristic." *Hecht*, 499 Mich at 608. But "[i]n order for this type of 'similarly situated' evidence alone to give rise to such an inference . . . the 'comparable' employees must be 'nearly identical' to the plaintiff in all relevant respects." *Id*. (citation omitted). The parties do not dispute the first three elements of the *McDonnell Douglas* framework. Thus, the only relevant question is whether plaintiff's "job was given to another person under circumstances giving rise to an inference of unlawful discrimination," on the basis of his age, sex, and national origin. *Hazle*, 464 Mich at 463.

The evidence shows that plaintiff's second term of employment began in February 2020. Around this same time, defendants hired Dr. Salas, a female, Hispanic neurosurgeon, who is seven years younger than plaintiff. Defendants proffered that Dr. Salas's hiring was designed to expand St. Mary's neurosurgery program and assist plaintiff in his role as Chief of Neurosurgery, not replace him. Plaintiff was the only neurosurgeon employed by St. Mary's until Dr. Salas was hired. Dr. Salas's employment officially began in April 2020, nearly two months after plaintiff's second term of employment began. After plaintiff was terminated, defendants removed his clinical privileges and enforced the noncompete clause in the Agreement. Dr. Salas, as the only remaining neurosurgeon, assumed plaintiff's clinical responsibilities.

As of August 2020, St. Mary's had 926 delinquent medical records. Of those outstanding records, plaintiff was responsible for 135 records, the second highest number. Plaintiff also appeared on the weekly suspension lists "at least twelve times" for failing to timely complete medical records. While no neurosurgeon, other than plaintiff, had been terminated for failing to timely complete medical documentation, there were other physicians that did not share plaintiff's protected characteristics who either received warnings, discipline, or suspension as a result of failing to timely complete medical records. But none of the other physicians were neurosurgeons, and none of them had more than three appearances on the weekly suspension list, unlike plaintiff. Similarly, there were no other neurosurgeons who were terminated for failing to timely respond to

---

[4] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

on-call notifications.[5] But physicians without plaintiff's protected characteristics had received warnings, discipline, or suspensions for failing to timely respond for on-call duty or provide on-call patient care. More specifically, one doctor failed to respond on two occasions, and another doctor failed to respond on a single occasion. Again, neither of these physicians were neurosurgeons.

Plaintiff asserts he proffered circumstantial evidence of defendants' discrimination sufficient to survive summary disposition because the evidence showed that Dr. Salas, a Hispanic woman seven years younger than plaintiff, replaced him after his termination. Further, plaintiff contends that he was treated differently than physicians who did not possess his protected characteristics but who also failed to timely complete medical records or respond to on-call notifications. But there is no evidence implying that Dr. Salas assumed plaintiff's duties after his termination because of her age, sex, or national origin. Rather, the evidence suggests that Dr. Salas assumed plaintiff's duties because she was the only remaining neurosurgeon employed by defendants. Additionally, all of the physicians identified by plaintiff are not similarly situated to him because none of them were neurosurgeons or were suspended to the same extent as plaintiff. Only one other physician was identified as having issues with both timely completing medical documentation and responding to on-call notifications. But again, that physician was not a neurosurgeon and did not engage in conduct to the same extent that plaintiff did. Thus, plaintiff failed to demonstrate that he was treated unequally compared to similarly situated employees who did not share his protected characteristics, and the trial court did not err by concluding that he failed to establish a prima facie case of discrimination.[6] See *Hecht*, 499 Mich at 608. Accordingly, the trial court properly dismissed plaintiff's claims premised on ELCRA.

## IV. BREACH OF CONTRACT

Plaintiff asserts the trial court erred by granting summary disposition to defendants regarding his breach of contract claim because there was a genuine issue of material fact whether defendants breached the terms of the Agreement by failing to pay him for on-call neurosurgical work. We disagree.

In a breach of contract claim, the plaintiff must show

(1) that there was a contract, (2) that the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the

---

[5] Plaintiff disputed whether he failed to timely respond when on-call and whether he properly trained Dr. Salas regarding her on-call responsibilities. Nonetheless, plaintiff acknowledged that he was providing services to another hospital and agreed that he could not service both hospitals on the same dates.

[6] In light of our conclusion that plaintiff failed to establish a prima facie case of discrimination, we need not determine whether defendants articulated legitimate, nondiscriminatory reasons for terminating plaintiff or whether plaintiff could show that defendant's rationale was pretext for discrimination. See *Hazle*, 464 Mich at 464; *White v DOT*, 334 Mich App 98, 108; 964 NW2d 88 (2020).

breach. The primary goal of contract construction is to give effect to the parties' intent. To achieve this goal, the Court must read the contract language, giving it its plain and ordinary meaning. When the language of the contract is unambiguous, the contract must be interpreted and enforced as written. When the contract language is subject to multiple interpretations, it is considered ambiguous. Ambiguities in a contract generally raise questions of fact for the jury; however, if a contract must be construed according to its terms alone, it is the court's duty to interpret the language. [*Total Quality, Inc v Fewless*, 332 Mich App 681, 694; 958 NW2d 294 (2020) (quotation marks and citations omitted).]

Courts "may not rewrite contracts on the basis of discerned 'reasonable expectations' of the parties because to do so is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written[.]" *Burkhardt v Bailey*, 260 Mich App 636, 656-657; 680 NW2d 453 (2004) (quotation marks and citation omitted).

Regarding plaintiff's compensation for on-call neurosurgical services, the Agreement provides, in relevant part:

2. COMPENSATION

2.1. Compensation. Employer shall compensate Physician *for Services performed* in accordance with Exhibit B. Physician shall also be entitled to benefits in accordance with Exhibit C[.]

* * *

EXHIBIT B – COMPENSATION

* * *

D. Neurosurgery Call. Employer *shall* pay Physician $1,500.00 per day for neurosurgery call coverage. Physician is *expected* to provide an average of 20 call days per month. [Emphasis added.]

Under the plain, unambiguous terms of the Agreement, defendants were required to pay plaintiff $1,500 for each day that he *performed* on-call neurosurgical services. See *Manuel v Gill*, 481 Mich 637, 647; 753 NW2d 48 (2008) (noting that the word "shall" is considered mandatory language). The record shows that defendants directed plaintiff not to "perform any work activity on behalf of IHA and [St. Mary's,]" commencing November 3, 2020, through February 1, 2021, the date of termination. And plaintiff did not provide any on-call services during this 90-day notice period. Because plaintiff did not perform on-call services during that timeframe, defendants were not required to pay him under the Agreement's terms.

Plaintiff contends that the Agreement did not give defendants the discretion to preclude him from continuing his on-call responsibilities during the notice period. But plaintiff ignores the fact that there is no language in the Agreement that *prohibits* defendants from taking such action. Plaintiff also argues that even if defendants were able to preclude him from performing his on-call

duties, the Agreement did not relieve defendants of their obligation to compensate plaintiff for all on-call work that he otherwise would have performed during the notice period. Again, the Agreement only obligates defendants to pay plaintiff for services he *actually performed*. Although it was *expected* that plaintiff would provide about 20 on-call shifts each month, the Agreement's language does not indicate that it was *mandatory* for plaintiff to provide these services. See *Merriam-Webster's Collegiate Dictionary* (11th ed) (defining "expected" as "regarded as likely" or "anticipated"); see also *Burkhardt*, 260 Mich App at 656-657. Plaintiff even admitted that, before his termination, he never received on-call pay when he was not providing on-call services. For these reasons, the trial court did not err by granting summary disposition to defendants regarding plaintiff's breach of contract claim.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Anica Letica
/s/ Randy J. Wallace